AMERICAN MOTOR COACH SYSTEM, Inc., v. CITY OF PHILADELPHIA et al.

AMERICAN TRANSIT CO. v. SAME.

Circuit Court of Appeals, Third Circuit. October 1, 1928.

Nos. 3832, 3833.

See, also, 18 F.(2d) 991.

Earl G. Harrison, Saul, Ewing, Remick & Saul, and Howard M. Long, all of Philadelphia, Pa., for appellants.

Augustus Trask Ashton, City Sol., John B. Gest, and James Francis Ryan, Asst. City Sols., all of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. These two cases are here on appeals of the plaintiffs in the District Court from decrees dismissing their bills to restrain the city of Philadelphia from enforcing its ordinance of June 24, 1924, providing that no motorbus carrying passengers for hire shall be operated in or upon the streets and highways of the city of Philadelphia without paying a license fee of $50.

The ordinance under which the city of Philadelphia required the buses to pay the license fee to the city was passed pursuant to the provisions of the Pennsylvania Motor Vehicle Law of 1919 (Laws 1919, p. 678) as amended by the acts of 1921 (Laws 1921, p. 582), 1923 (Laws 1923, p. 718), and 1925 (Laws 1925, p. 254). Section 9 of the act provides that the fees for the registration of motor vehicles shall be in lieu of any other fees or taxes imposed by the commonwealth or any subdivision thereof, and that no city, borough, incorporated town, township, or county shall require or collect any registration or license fee or tax for any motor vehicle or license from any operator thereof, except as to motor vehicles transporting passengers for pay or hire within the limits of any city or from points within such city to points outside of the city limits.

It is further provided in section 28 of the act that any *city* may regulate the transportation by motor vehicles of passengers for pay within the limits of such city or from points in the city to points beyond the city limits and make and enforce regulations for the operation of such vehicles, not inconsistent with the act, and designate the streets upon which such vehicles may be operated. Section 1 of the ordinance provides that:

"The Council of the City of Philadelphia ordains that no motor-bus for public use in the carriage of passengers for hire upon any of the streets, avenues, bridges, highways, boulevards or public places in the City of Philadelphia and running wholly or in part within such city under authority of any ordinance or otherwise, including sight-seeing buses, shall be run or operated after the effective date of this ordinance unless and until a license be first obtained by the owner, lessee or bailee of such vehicle from the Department of Public Safety, Bureau of Police. A separate application shall be filed for such motor-bus to be licensed hereunder upon a form provided by said bureau and containing the same information which is provided to be given in the first paragraph of Section 2 of an ordinance approved July 2, 1915, entitled 'An ordinance to regulate the operation of motor-buses in the city of Philadelphia and providing for the license thereof': Provided, that the superintendent of the said bureau may in any case in his discretion dispense with so much of the information prescribed by said paragraph as in his judgment may be deemed unnecessary. Before any such license shall be issued the applicant or applicants therefor shall produce a receipt from the Receiver of Taxes showing the payment by the person or persons, firm, association or corporation in the sum of fifty ($50) dollars for each vehicle so licensed."

Section 2 of the Ordinance of July 2, 1915, referred to above reads as follows:

"That no motor-bus shall be operated in or upon the streets of the City of Philadelphia unless a license be first obtained by the owner, lessee or bailee, from the Department of Public Safety (Bureau of Police). Application for a license shall be made to said Bureau of Police upon a form provided by it, and shall give the name, age, and residence of the person or persons applying therefor; if a partnership or association, the

names, ages and residences of the person or persons composing such partnership or association; if a corporation, the corporate name and place of incorporation, with the names and residences of the officers. The applicant shall also state whether he is the owner, lessee, or bailee of the motor-bus sought to be licensed, and the experience and qualifications as a driver of motor vehicles of the person who is to operate said motor-bus, and route or routes over which it is proposed to operate such motor-bus, together with such other information as the said Bureau of Police may require. A separate application shall be filed for each motor-bus to be licensed, in which such motor shall be described by giving the make of the car, factory number, motor number and the State license number, together with the number of persons including the driver, who are to be carried thereon. Every application shall be acknowledged before a notary public or other person duly authorized to administer oaths."

The bills in both cases are based upon practically the same facts and are controlled by the same principles of law. Injunctions pendente lite were granted when the bills were filed. Upon a preliminary hearing, the court vacated the restraining order. No additional evidence was offered on final hearing and the court entered final decrees dismissing the bills.

The plaintiffs contend that the ordinance requiring each of the buses to pay a license fee of $50 and to furnish the information specified therein does not constitute a valid exercise of the police power of the city of Philadelphia, but imposes an undue burden upon interstate commerce and so violates the Constitution of the United States. The respondent, on the other hand, contends that the requirement of the payment of the license fees by each of the buses by the city is a reasonable exercise of the police power of the city and does not constitute a direct or undue burden on interstate commerce in violation of the Constitution of the United States.

The buses in question do an admittedly interstate business, carrying passengers for pay between Philadelphia, Pa., and Wilmington, Del.; Philadelphia and Atlantic City, N. J.; and Philadelphia and New York City, N. Y.

There is but a single question for determination: Whether the ordinance requiring the owner of every motorbus to file with the bureau of police the information required in the above ordinance and to pay a license fee of $50 for each motorbus, is a reasonable exercise of the police power of the city and

so is valid and constitutional, or whether it is a direct and undue burden on interstate commerce and so unconstitutional.

■ The power which the commonwealth itself may directly exercise, it may delegate to a municipality to exercise. No state may impose a direct burden upon interstate commerce. Any statute which by its necessary operations interferes with or burdens foreign commerce is a prohibited regulation. Shafer v. Farmers' Grain Company, 268 U. S. 189, 199, 45 S. Ct. 481, 69 L. Ed. 909. The requirement by a state that a license fee be paid to engage in interstate commerce is a tax on the privilege and a condition precedent to conducting business which is a direct burden on interstate commerce and so is unconstitutional, no matter how good the purpose may seem to be for imposing it. If a state may make its consent a condition precedent to the privilege of carrying on interstate commerce, it may withhold its consent and thus absolutely regulate such commerce. Congress alone has power "to regulate commerce with foreign nations, and among the several states." Article 1, section 8, paragraph 3, Constitution of the United States; Gloucester Ferry Company v. Pennsylvania, 114 U. S. 196, 5 S. Ct. 826, 29 L. Ed. 158; Crutcher v. Kentucky, 141 U. S. 47, 58, 11 S. Ct. 851, 35 L. Ed. 649; Erb v. Morasch, 177 U. S. 584, 20 S. Ct. 819, 44 L. Ed. 897; Adams Express Company v. New York, 232 U. S. 14, 34 S. Ct. 203, 58 L. Ed. 483; City of Sault Ste. Marie v. International Transit Company, 234 U. S. 333, 34 S. Ct. 826, 58 L. Ed. 1337, 52 L. R. A. (N. S.) 574; Real Silk Hosiery Mills v. City of Portland et al., 268 U. S. 325, 45 S. Ct. 525, 69 L. Ed. 982; Di Santo v. Pennsylvania, 273 U. S. 34, 47 S. Ct. 267, 71 L. Ed. 524.

■ But in the absence of federal legislation covering the subject, a state, or city to which it has delegated the power, may impose upon vehicles using the highways, exclusively in interstate commerce, regulations for insuring the public safety and convenience and such a license fee as will reasonably defray the expense of administering the regulations and be a fair contributive share to the cost of constructing and maintaining the public highways and facilities furnished by the State. Hendrick v. Maryland, 235 U. S. 610, 35 S. Ct. 140, 59 L. Ed. 385; Pierce Oil Corporation v. Hopkins, 264 U. S. 137, 44 S. Ct. 251, 68 L. Ed. 593; Michigan Public Utilities Commission et al. v. Duke, 266 U. S. 570, 45 S. Ct. 191, 69 L. Ed. 445, 36 L. Ed. 1105; Buck v. Kuykendall, 267 U. S. 307, 315, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286;

Bush & Sons Co. v. Maloy et al., 267 U. S. 317, 45 S. Ct. 326, 327, 69 L. Ed. 627; Clark v. Poor, 274 U. S. 554, 47 S. Ct. 702, 71 L. Ed. 1199; Sprout v. City of South Bend, 277 U. S. 163, 48 S. Ct. 502, 72 L. Ed. 833 (decided May 14, 1928).

At the same time this exercise of the police power of the state, the burdens imposed and the demands made must be reasonable. Crutcher v. Kentucky, supra; Western Union Telegraph Company v. Kansas, 216 U. S. 1, 30 S. Ct. 190, 54 L. Ed. 355; Adams Express Company v. New York, supra; Sault Ste. Marie v. International Transit Company, supra. Were the regulations established to insure the safety and convenience of the public reasonable? Was the fee exacted such an amount as was reasonably required to defray the expense of administering the regulations and as constituted a fair contribution of the buses toward the cost of constructing and maintaining the streets or highways used?

The information required as to the routes to be traveled, the owner, the bus, and the driver tended to insure convenience and safety to the traveling public. The reasonableness of this requirement has been well stated in the learned opinion of the District Judge:

"The application for the motor-bus driver's license requires a statement of his name and residence, age, height, color of hair, color of eyes, weight, nationality, and whether black or white; the number of his State operator's license; the number of years' experience he has had in operating motor vehicles; whether he has ever driven a motor-bus or other public vehicle; if so, how long, and the name and address of the person employing him at the time; also whether or not he has been convicted of any crime. He is required to furnish a photograph, which is to be affixed to his bus driver's identification card. He is also required to obtain references from two reputable business men concerning his good moral character and good repute. * * *

"It is surely essential to the orderly supervision of traffic of this nature that the streets to be traversed in Philadelphia in the route of the buses, and their starting point and terminus shall be designated. And there are good reasons also for requiring that, in the identification of buses licensed to traverse certain streets, each bus shall have placed upon it the city license plate or tag. How else would the officers assigned by the Bureau of Police be able to supervise the operation of any particular line of buses? Public buses

cannot be operated to the advantage of their operators and the public, unless they traverse designated routes, so that the public will know where they may be taken on as passengers and where they may alight. These routes being, therefore, necessarily fixed, it is not unreasonable to require their designation to be filed for immediate reference in the appropriate office. Such requirements of information for the identification of the buses and their routes and their owners are considered by Councils and the police authorities necessary, in the exercise of the police power of supervision and inspection, for the general purpose of public safety and of maintenance of good order in traffic. The power claimed is analogous to the right of inspection, for the safety of the public, of food stuffs, and dangerous articles of commerce, which has been sustained as a lawful exercise of the police power. Savage v. Jones, 225 U. S. 501, 32 S. Ct. 715, 56 L. Ed. 1182; Standard Stock Food Co. v. Wright, 225 U. S. 540, 32 S. Ct. 784, 56 L. Ed. 1197; Red 'C' Oil Co. v. North Carolina, 222 U. S. 393, 32 S. Ct. 152, 56 L. Ed. 240.

"It is also the judgment of the city authorities that it is necessary, in the exercise of supervision of traffic, that the bus driver be required to be licensed for the particular sort of work in which he is engaged, driving, as he must, a heavy vehicle, occupying a large part of the space upon the highway, and being entrusted with the safety of life and limb of passengers, as well as others, upon the highways. Unless he is identified by the card which the police require him to have, with his photograph thereon, it would be impossible for an officer to determine whether or not he is the person who is authorized under the license to drive the vehicle. It is a valid exercise of police power to require various things of those engaged in interstate traffic. A railroad traversing the city streets may be required to place safety gates upon the highway, or to ring a bell or sound a whistle on approaching crossings. The engineer may be required to demonstrate his skill and ability to operate a railroad locomotive, without placing undue burdens upon interstate commerce. Smith v. Alabama, 124 U. S. 465, 8 S. Ct. 564, 31 L. Ed. 508.

The facts which the ordinance required the applicant to disclose under oath furnished the bureau of police with such information as it should possess in order to determine whether or not the applicant and driver were such persons as could safely be entrusted with the lives and property of the traveling public.

The fee was in no way an excise on the privilege of engaging in interstate commerce. The testimony conclusively shows that the fee was based on the actual expense incurred in enforcing the ordinance. William B. Mills, superintendent of police, testified that the increase in the bus business became a serious interference with traffic on the streets. More than 500 buses carrying passengers for hire were in operation on the streets of Philadelphia and more than half of these were engaged in interstate traffic. The interference with other traffic became so serious that the regulation became a necessity for the protection of the citizens of Philadelphia. The necessity for the passage of this ordinance was shown in the opinion of Judge Thompson. He said:

"In order to appreciate the necessities of the situation which induced city councils to pass the ordinances under attack and the Legislature to extend the power to cities, we must consider what we see about us. The population of the city of Philadelphia has increased to approximately two million. It has hundreds of miles of streets, many of which are narrower than those in municipalities more recently laid out barely wide enough to accommodate the traffic of twenty-five years ago, when the motor vehicle was unknown, but now daily congested through the endless procession of automobiles, motor-trucks, and motor-buses, which also, in the exigencies of business and pleasure, occupy much of the roadways while stopping to load and unload, or while left parked along the sidewalks.

"Added to the heretofore constantly increasing number of passenger automobiles and motor-trucks carrying merchandise, has now come the motor-bus for the carriage of passengers within the city limits and beyond. These motor-buses are built with the design to contain as many passengers as can be profitably carried. They occupy a large part of the space upon the streets through which they travel, and their weight and size is such that, unless driven with due care by skillful operators, they become a menace to pedestrians at the street crossings and to other vehicles and their occupants in the use of the roadways."

At the time of passing the ordinance, the city estimated the total expense of policemen and other members of the department of public safety assigned to the inspection and supervision of the operation, the purchase of the necessary filing equipment, the printing of necessary forms, the purchase of tags and the payment of necessary clerk hire. The total estimated expense divided by the total number of buses, interstate and intrastate, gave the quotient or amount necessary to charge each bus to defray the expenses for the inspection, supervision and administration of the act. The result showed that about $50 per bus would be required to pay the expenses made necessary by the operation of the buses on the city streets. Up to the time of the hearing, the fees collected slightly exceeded the expense. But the estimation and expense did not take into account the cost of constructing and maintaining the streets. It is seriously doubted that $50 per bus will pay the expense of administering the ordinance alone in future as the calculations and collections were for the "slack" winter months only. In view of the fact that the construction and maintenance of the streets were not considered, it is evident that $50 per bus is a very reasonable license fee and the passage of the ordinance establishing the regulations and requiring the license fee was a reasonable exercise of the municipal police power delegated by the commonwealth.

The decrees of the District Court are affirmed.