## INTERSTATE TRANSIT, INCORPORATED, *v.* LINDSEY, COUNTY COURT CLERK.

No. 358.  Argued March 19, 1931.—Decided April 13, 1931.

Messrs. *J. Carlton Loser* and *Thomas L. Tallentire,* with whom *Messrs. H. Lynne Barber* and *J. G. Lackey* were on the brief, for appellant.

*Mr. William F. Barry, Jr.,* argued the cause, and *Messrs. L. D. Smith,* Attorney General of Tennessee, and *Roy H. Beeler,* Solicitor General, submitted a brief for appellee.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

The Tennessee Act of 1927, c. 89, § 4, imposes upon concerns operating interstate motor busses on the highways of the State a privilege tax graduated according to carrying capacity. It is $500 a year for each vehicle seating more than twenty and less than thirty passengers. The tax for eight such busses was demanded of Interstate Transit, Inc., an Ohio corporation which operates, exclusively in interstate commerce, a line from Cincinnati, Ohio, to Atlanta, Georgia. The company made a quarterly payment under protest and brought this suit to recover the amount paid, on the ground that the statute as applied violates the commerce clause of the Federal Constitution. The trial court allowed recovery, but its judgment was reversed by the Supreme Court of the State. 161 Tenn. 56; 29 S. W. (2d) 257. The case is here on appeal.

While a State may not lay a tax on the privilege of engaging in interstate commerce, *Sprout* v. *South Bend,* 277 U. S. 163, it may impose even upon motor vehicles engaged exclusively in interstate commerce a charge, as compensation for the use of the public highways, which is a fair contribution to the cost of constructing and maintaining them and of regulating the traffic thereon. *Kane* v. *New Jersey,* 242 U. S. 160, 168–169; *Clark* v. *Poor,* 274 U. S.

554; *Sprout* v. *South Bend, supra,* pp. 169–170. As such a charge is a direct burden on interstate commerce, the tax cannot be sustained unless it appears affirmatively, in some way, that it is levied only as compensation for use of the highways or to defray the expense of regulating motor traffic. This may be indicated by the nature of the imposition, such as a mileage tax directly proportioned to the use; *Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245, or by the express allocation of the proceeds of the tax to highway purposes, as in *Clark* v. *Poor, supra,*[1] or otherwise. Where it is shown that the tax is so imposed, it will be sustained unless the taxpayer shows that it bears no reasonable relation to the privilege of using the highways or is discriminatory. *Hendrick* v. *Maryland,* 235 U. S. 610, 612; *Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245, 250–252. Compare *Interstate Busses Corp.* v. *Holyoke Street Ry.,* 273 U. S. 45, 51. But the mere fact that the tax falls upon one who uses the highway is not enough to give it presumptive validity.

A detailed examination of the statute under which the tax here challenged was laid makes it clear that the charge was imposed not as compensation for the use of the highways but for the privilege of doing the interstate bus business. Chapter 89 of the Acts of 1927 deals with practically all of the taxes laid by the State, except those relating to highways. It is entitled "An Act to provide for General Revenue for the State of Tennessee and the counties and municipalities thereof, to be known as the General Revenue Bill." The scope of this statute conforms to the title. It consists of twenty-one sections.

---

[1] The Ohio statute there involved declared that the taxes were laid, and were to be used only for, the maintenance and repair of highways and for the regulation of motor traffic. Ohio General Code, § 614-94, § 614-96. The "other purposes," referred to in the opinion, 274 U. S. at p. 557, were the general expenses of the state motor vehicle department as distinguished from expenditures specifically upon the highways.

The first three impose general property, inheritance, and merchants' capital taxes. Section 4, under which the tax challenged is laid, declares " That each vocation, occupation and business hereinafter named in this section is hereby declared to be a privilege, and the rate of taxes on such privileges shall be as hereinafter fixed." Then follows a schedule occupying 53 pages, in which 160 businesses are arranged, in the main, alphabetically, and in which the several motor bus businesses have their appropriate places. This is followed by six additional sections which deal exclusively with similar privilege taxes. The remaining sections relate to enforcement.

The tax on interstate busses is of the same character as the tax laid for the privilege of engaging in every other line of business. The taxes for the several businesses range from $2.50 to $5000; and since they differ widely in amount even for the same business, appear to be graduated according to the assumed earning capacity. In most, the amount demanded increases with the population of the city, town, or district in which the business is carried on. For some a different basis of gauging probable earning power is adopted. On warehouses the tax is graduated according to storage capacity. On theatres it is graduated according to seating capacity. On the business of operating busses it likewise varies according to seating capacity. The latter tax is specified separately for interstate busses, for intrastate busses operating in more than one county, and for those operating in a single county. But this separation appears to be made solely because of the allocation of the proceeds of the tax.[2] For the rate of taxation is the same for each, and varies solely with the carrying capacity of the bus; there being steep

[2] Where an intrastate bus operates for more than half of its total mileage on a county maintained road the Act provides that one-half of the tax shall be retained by the county for road purposes. But taxes collected from interstate busses are not so allocated.

increases from $50 a year for one carrying not more than five passengers to $750 for one carrying over thirty.[3]

The conclusion that the tax challenged is laid for the privilege of doing business and not as compensation for the use of the highways is confirmed by contrasting § 4 of the 1927 Act with those statutes which admittedly provide for defraying the cost of constructing and maintaining highways and regulating traffic thereon. The former declares specifically in connection with the privilege tax on interstate busses that the proceeds " shall go and belong exclusively to the General Funds of the State." On the other hand, in the legislation by which Tennessee has provided for defraying the cost of constructing and maintaining the state highways and regulating motor traffic, it has been the consistent practice to prescribe that moneys raised for this purpose shall be segregated and go into the Highway Fund. The present system of motor regulations was inaugurated in 1915.[4] At the same session, the legislature created a State Highway Commission with power to construct and maintain highways.[5] In

[3] Four intermediate classifications are provided: $100 for busses carrying between five and ten passengers; $200 for one carrying between ten and fifteen; $350 for one carrying between fifteen and twenty; and the tax in suit, $500 for a bus carrying between twenty and thirty passengers.

[4] In 1915 an annual registration fee based upon seating capacity was required of all automobile owners. Pub. Acts 1915, c. 8, §§ 1, 5. In 1917 the fee was made dependent upon rated horsepower, and the use of the proceeds was limited to administrative expenses of the motor vehicle department and maintenance of the highways. Pub. Acts 1917, c. 73, §§ 2, 7. Formal amendments were made in Pub. Acts 1919, c. 149, § 15; Pub. Acts 1921, c. 131; Pub. Acts 1923, c. 10, § 1; c. 108, § 1; Pub. Acts 1929, c. 14, § 1. A very early Act had provided for the registration of all motor vehicles at a nominal fee of two dollars, and had established speed limits. Pub. Acts 1905, c. 173, § 1.

[5] Pub. Acts 1915, c. 100, §§ 1–11. This same statute first established a State Highway Fund to be accrued from registration fees and penalties, and to include federal aid grants. This fund was to be used

these statutes and in many later ones—prescribing additional fees for the registration and licensing of motor vehicles,[6] imposing gasoline taxes,[7] laying a one mill road tax,[8] and authorizing the issue of bonds for the construction of highways and bridges,[9]—the legislature provided that the proceeds of the fees, taxes, and bonds, and of the tolls collected on bridges, should be set apart as state highway and bridge funds to be expended by the Commission exclusively for the construction and maintenance of highways or bridges. The absence in § 4 of this provision, which characterizes almost every other Tennessee statute relating to the construction and maintenance of highways or the regulation of motor vehicle traffic, is additional evidence that the present tax was not exacted for such purposes, but merely as a privilege tax on the carrying on of interstate business.

---

solely for the maintenance of state highways. *Id.*, §§ 12, 14. See also Pub. Acts 1917, c. 16, § 2, c. 58, and c. 74, § 1, the last establishing a separate State Aid Road Fund; Pub. Acts 1919, c. 149, §§ 1–14, 26, reorganizing the State Highway Commission and repealing the 1915 Act; Pub. Acts 1923, c. 7, §§ 1, 33–35, reorganizing all State Departments and repealing the 1919 Act.

[6] See Note 4, *supra*.

[7] Pub. Acts 1923, c. 58, §§ 1, 12; as amended by Pub. Acts 1925, cc. 4, 13, 19, 20; Pub. Acts 1929, c. 11, §§ 1, 2, c. 27, § 1, c. 124, § 1; Pub. Acts 1929, Extraordinary Sess., c. 28. See also Pub. Acts 1927, c. 22, establishing a Division of Motors and Motor Fuels and levying an additional tax on gasoline dealers to defray its expenses. Compare *Williams* v. *Standard Oil Co.*, 278 U. S. 235. One-tenth of one per cent. per gallon of the State Gasoline tax was, however, set aside as a Sinking Fund for the retirement of the Tennessee Great Smoky Mountain Park Bonds. Pub. Acts 1927, c. 54, § 15.

[8] Pub. Acts 1917, c. 74, §§ 1, 2; as amended by Pub. Acts 1919, c. 188; tax repealed, Pub. Acts 1923, c. 62.

[9] *E. g.*, Pub. Acts 1925, c. 72, § 1; Pub. Acts 1927, c. 1, § 5; *id.*, c. 6, § 4; *id.*, c. 37, §§ 6–7; *id.*, c. 83, §§ 1–2; Pub. Acts 1929, c. 5, § 6; *id.*, c. 36, §§ 1–2; *id.*, c. 104, §§ 4, 6–7; *id.*, c. 112, §§ 4, 6–7; Pub. Acts 1929, Extraordinary Sess., c. 33.

It is suggested that a tax on busses graduated according to carrying capacity is common and is a reasonable measure of compensation for use of the highways. It is true that such a measure is often applied in taxing motor vehicles engaged in intrastate commerce.[10]  Being free to levy occupation taxes, States may tax the privilege of doing an intrastate bus business without regard to whether the charge imposed represents merely a fair compensation for the use of their highways. Compare *Gundling* v. *Chicago,* 177 U. S. 183, 189. But since a State may demand of one carrying on an interstate bus business only fair compensation for what it gives, such imposition, although termed a tax, cannot be tested by standards which generally determine the validity of taxes. Being valid only if compensatory, the charge must be necessarily predicated upon the use made, or to be made, of the highways of the State. *Clark* v. *Poor, supra.* In the present act the amount of the tax is not dependent upon such use. It does not rise with an increase in mileage travelled, or even with the number of passengers actually carried on the highways of the State. Nor is it related to the degree of wear and tear incident to the use of motor vehicles of different sizes and weights, except in so far as this is indirectly affected by carrying capacity.[11]  The tax is proportioned solely to the earning capacity of the vehicle. Accordingly, there is here no sufficient relation between the measure employed and the extent or manner of use, to justify holding that the tax was a charge made merely as compensation for the use of the highways by interstate busses. We need not therefore consider whether the tax exacted from this appellant is unreasonably large or unjustly discriminatory.                    *Reversed.*

---

[10] See Motor Vehicle Conference Committee, State Regulation of Motor Vehicle Common Carrier Business (1930).

[11] Compare *id.*, State Restrictions on Motor Vehicle Sizes, Weights, and Speeds (1931); Public Roads, Vol. 6, No. 8 (1925), pp. 165–68.

MR. JUSTICE McREYNOLDS is of opinion that the judgment should be affirmed.