**MORF v. INGELS, Director of Motor Vehicle Department of California, et al.**
**No. 759.**

District Court, S. D. California, Central Division.
May 5, 1936.

Pierson & Block, Ralph K. Pierson, and Samuel P. Block, all of Compton, Cal., and Byron J. Walters, of Los Angeles, Cal., for plaintiff.

U. S. Webb, Atty. Gen., and Frank Richards, Deputy Atty. Gen., for defendants.

Before MATHEWS, Circuit Judge, and STEPHENS and YANKWICH, District Judges.

STEPHENS, District Judge.

The plaintiff seeks to enjoin state officials from enforcing a state law which allegedly invades his rights under the Federal Constitution. Upon issue joined, the case was tried and submitted for decision in a three-judge court.

For several years automobiles have been transported upon their own wheels from

eastern points for sale in California. The practice increased so that automobiles, or cars, as we shall hereafter generally refer to them, were being brought into California singly and in fleets of from three to forty. In the fleets which were commanded by experienced men there were single cars and cars that were linked together; the leading one pulling the other. Up to November 29th last about 14,000 cars had been rolled into the state during the year, and it is safe to say that the number exceeded 15,000 for the full year. The fleet movement, where made up of more than four automobiles, caused certain traffic difficulties, such as passing the fleet and meeting cars while passing it. The fleet would sometimes stop, affecting the flow of traffic. When motor police would stop a car in the fleet, those following would sometimes drive so as to interfere with other traffic. The drivers were not always careful as to their automobile lights, and the towed car sometimes swayed. Some of the drivers were unfamiliar with California traffic regulations and some were fatigued.

Plaintiff is a wholesale dealer of used cars, with his principal place of business in Los Angeles. He sells cars for delivery in other parts of the state and a smaller number for delivery in the North Pacific States. He buys cars and brings them into California singly and by twos coupled and sometimes in fleets of several. The cars are operated directly under his supervision and responsibility and not under contract. Although he has been operating this way for several years, no traffic trouble has occurred in connection with his activity. The specific complaints in this case are, first the demand for a license fee for driving a single car, not in fleet, across the California line from Arizona and, second, demands for license fees for so driving a car with another car attached. Between 30% and 40% of such imported cars are driven to and across the California state line singly and not in company with other automobiles. Plaintiff's business is large and lucrative, but it would appear that the required $15 license fee for each car he brings into California would practically absorb his net profit and would ruin his business. It is a serious situation for him and others in like circumstances.

### The Basic Theory of National Unity and Equality of the Laws.

Preferential laws for state industries and the rivalry for foreign commerce prompted the enactment of tariffs against foreign imports between the states under the old federation. This situation was very detrimental to national peace and unity, and was one of the primary causes for the constitutional requirement that "all Duties, Imposts and Excises shall be uniform throughout the United States" and for the constitutional provision that Congress should have the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes" (article 1, § 8), and that "no State shall, without the Consent of Congress, lay any Duty or Tonnage" (article 1, § 10). Through the Fifth and the Fourteenth Amendments the Constitution has provided for the security of property and for the personal freedom from arbitrary state action under the clauses requiring due process of law and the equal protection of the laws. In many instances the states have legislated in contravention of these "equality" principles, a practice certainly to be guarded against with vigilance equal to that we should use against encroachment of national legislation upon the reserved rights of the states. Through the years the courts have met the difficult problems of construing the enacted statutes under these constitutional rules.

No nice and undeviating line has been discovered marking legislation on the one side in harmony with these constitutional provisions and on the other in conflict with them, but action has been held within a fairly narrow zone of deviation, under new and changing conditions, through the process of classification.

"The equal protection of the laws means subjection to equal laws, applying alike to all in the same situation. * * * While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed." Southern Ry. Co. v. Greene, 216 U.S. 400, 30 S.Ct. 287, 289, 54 L.Ed. 536, 17 Ann.Cas. 1247; Darnell & Son Co. v. Memphis, 208 U.S. 113, at page 120, 28 S.Ct. 247, 250, 52 L.Ed. 413; Continental Baking Co. et al. v. Woodring, 286. U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155, 81 A.L.R. 1402.

### Classification cannot be Sustained.

The California Legislature of 1935 legislated extensively upon the subject of mo-

tor transportation. It adopted the Vehicle Code (St.1935, p. 93) and many other acts relating to the subject of motor transportation, including the so-called Caravan Act (chapter 402, p. 1453, St.1935), here under consideration. In section 146.5 of the Vehicle Code it provided for the registration of cars previously registered outside California. This District Court, sitting as a three-judge court, recently declared this section unreasonable, discriminatory, and void. Asher & Ponder v. Ingels et al. (D.C.) 13 F.Supp. 654. Ostensibly its purpose was to prevent the importation of stolen cars into California; actually it practically prohibited the sale of cars in California that had been registered elsewhere. We have referred to these several acts to show that the Legislature covered the subject of motor vehicle transportation comprehensively and, through separate but related acts, sought to apply its legislative discretion to all conditions it deemed desirable to treat. The purpose of each act is more easily understood and the expressed purpose in each act becomes more definitely a limitation upon its basic theory and purpose through such information.

The term "caravan" as applied to and used in the act under consideration is a misnomer and leads to misunderstandings. In a metaphoric sense, it has come to mean a considerable number of persons journeying in company by several or many vehicles. Fleet movement of cars may with propriety be termed caravans.

But the so-called "caravan act," although including such fleet movement of cars as hereinbefore described, is by no means limited thereto. In fact, it straightway defines the term "caravaning" as the movement of a single car upon its own wheels into California to be sold. There is nothing in the act that even refers to caravaning as that term is commonly understood, except that not more than three "vehicles or groups of vehicles" can be operated legally upon the highways unless spaced 150 feet. But this provision applies only to cars for sale that are rolled by highway into California upon their own wheels. There is nothing in the act indicating that the Legislature has determined that the practice of bringing cars into California for sale in this way is undesirable or that the act is intended to prevent, limit, or regulate the practice, except as to the spacing mentioned. There

is nothing in the evidence that indicates any police problem resulting from the use of the highway except through fleet or caravan formation. Yet the act is specifically directed to each and every car falling within the prescribed specifications, in fleet or not, to wit, entering California upon its own wheels and being for sale.

The Supreme Court in Darnell & Son Co. v. Memphis, supra, quoted the following from Guy v. Baltimore, 100 U.S. 434, 25 L.Ed. 743, with approval: "In view of these and other decisions of this court, it must be regarded as settled that no state can, consistently with the Federal Constitution, impose upon the products of other states, brought therein for sale or use, or upon citizens because engaged in the sale therein, or the transportation thereto, of the products of other states, more onerous public burdens or taxes than it imposes upon the like products of its own territory. If this were not so, it is easy to perceive how the power of Congress to regulate commerce with foreign nations and among the several states could be practically annulled, and the equality of commercial privileges secured by the Federal Constitution to citizens of the several states be materially abridged and impaired." See, also, Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264.

Most, if not all, of the cases relied upon for the validity of the act are common carrier cases—cases arising from the business of selling transportation upon and along the public highways. In such cases, subject to reasonableness and to the interstate commerce clauses of the Federal Constitution, the state denies, permits, regulates, and licenses such businesses. The permits issued and license fees paid are for continuing operation. The vehicles used are usually large and heavy, burdening the road and its roadbed. The difference is obvious between such cases and the instant one, where only ordinary automobiles for which the highways were primarily constructed are transported over but a few miles of highway and for but a few days (usually not a whole day), under the license permit. Expressions in opinions of courts must be read accordingly. It must always be borne in mind that plaintiff is not a common carrier, accepts no article for transportation for hire, and transports only his own property. It would appear

that plaintiff has as good a right to the use of the highways as any one else transporting his own goods; subject, of course, to such police regulation as is reasonable in the circumstances. See Packard v. Banton, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596; also Buck v. Kuykendall, 267 U.S. 307, at page 314, 45 S.Ct. 324, 69 L.Ed. 623, 38 A.L.R. 286.

There is no doubt that classification to be legal need not approximate perfection, and, as said in Patsone v. Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 282, 58 L.Ed. 539, the Legislature "may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses." There are single and fleet movements of cars for sale from point to point within the state, and there are other instances of troublesome use of the highways in the state of California as well as across the state lines. Instance the grouping of large vision obscuring trucks with trailers, the practice of hauling from three to five automobiles upon one long truck and trailer, and the trailer living quarters so greatly on the increase. Under the doctrine expressed in the Patsone Case, such instances do not necessarily invalidate a classification. They are eloquent, however, of the fact that the defining elements of the Caravan Act classification are not elements of the wrong aimed at and do not gather together the common malefactors, but do arbitrarily and unreasonably embrace innocent actors. It should be noticed that the act extends its burdens to singly driven cars and two cars coupled together that do not add any specific police burden. These cars come into sales competition with cars driven wholly within the state for sale.

#### The License Fee of $15 Per Car is Arbitrarily Fixed and Unreasonable in Amount.

The purpose of assessing a fee for each car admitted, expressed in the act, is to defray the expenses of adequately policing the highways where used in this importing practice, together with the administrative expense of the act. The full sum collected goes into the general state fund. It is argued that the state may charge for the commercial use of its highways. We have already stated that the use plaintiff makes of the highways is not a privilege that will support a tax under the act for other than such extra policing reasonably required by fleet movement. But, aside from that, there is no basis in the act upon which a highway tax can be estimated or calculated. As to purposes of fee, see Interstate Transit, Inc., v. Lindsey, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953; Kane v. New Jersey, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222; Sprout v. South Bend, 277 U.S. 163, at pages 170 and 171, 48 S.Ct. 502, 72 L.Ed. 833, 62 A.L.R. 45; Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551.

There is a provision of the act to the effect that the licensing fee of $15 per car is in lieu of all other fees, but this is meaningless. It merely exempts the importing car operator from paying fees required of carriers defined and provided for in the other motor vehicle acts. But there is nothing in any act that requires the payment of any such fees by plaintiff or persons in his circumstances. The purchaser of the imported car must pay the regular state automobile license fee and must pay the property taxes placed upon the car in the same manner as upon any other car and to the same extent. The $15 fee cannot be bolstered into reasonableness through recital in the act of unreal benefits to the licensee.

Although there is language in the act that might seem to require it, we think no pains need be taken to discuss in full the claim of plaintiff that he need pay a $25 fee (it has not been demanded) before applying for the special permit hereinbefore mentioned nor that he is compelled against his will and against the facts obtaining to assume the status of a common carrier or a carrier for hire. California Carriers' Act, St.1935, p. 878. The so-called Caravan Act itself excludes such fee, and, if the law attempts to fix upon plaintiff a status not justified by the facts, it goes beyond the power of the Legislature, and is to that extent void as to him. Frost & Frost Trucking Co. v. Railroad Comm., 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457. It does not affect the other part of the statute, however, and is severable. For the theory of levying tax on vehicles using highways, see Interstate Transit, Inc., v. Lindsey, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953; Clyde Mallory Lines v. Alabama, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. ——; Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551.

We have examined the California Carriers' Act (chapter 223, p. 878, St.1935) and find that it does not affect plaintiff in any but in the most incidental and inconsequential manner, if at all.

We come directly to the reasonableness of the license fee. As shown by the evidence in this case, during the year 1935 a great increase of automobile use of the highways occurred, and for that year at least 15,000 cars were brought into the state for sale under conditions hereinbefore recited. The mileage for such cars within the state and the operation upon the highways under the permit is, of course, very little. They go only to the market place. The increased personnel of motor policemen along the routes used by these fleets, for care of all traffic conditions during 1935 up to date of hearing, amounted to but six, although a few more could be used handily. The salary of such officer averages around $200 per month. A few inspectors at the border offices have been put on since the passage of the law, and there is some clerical expense. Even if the whole increase of expense just indicated were charged to "caravaning," it would seem mathematically demonstrable that the figure of $15 per each imported car was not fixed upon any basis of compensating the state for policing and for administering the act. The evidence would indicate that ten additional employees would more than take care of the situation, including the generally increased traffic. Allowing $200 per month each, the sum would amount to $2,400, or for ten men $24,000, per year. Fifteen thousand cars at $15 per car would produce $225,000. Or, looking at it in another way, the distance from border point to point of destination can be traversed in less than a day. The $30 charge for each operating unit of two cars would pay for a special police patrol, and even under such regulation a great profit would result. Of course, there is no contention that such a service is required. There can be no doubt but that the license fee is excessive and arbitrary.

The Deputy Attorney General argues that the highways belong to the people and that their use for commercial purposes can be charged for, and he sought to show comparative railway charges for transporting automobiles. But this evidence has no materiality here. If the charge of $15 is intended as an equalization of transportation costs between railroads and highways, it rests upon an unsupportable premise.

The unreasonableness of the license charge discriminates against the plaintiff who brings cars into the state for sale in favor of those who deal in used cars obtained from within the state. The charge bears no reasonable relation to the purposes for which it is collected, and in practical effect constitutes a protective tariff and is unconstitutionally burdensome. Interstate Transit, Inc., v. Lindsey, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953; Young's Market Co. v. State Board of Equalization (D.C.) 12 F.Supp. 140, and cited authorities.

The clear statement of principles in Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, at pages 521, 523, inclusive, 55 S.Ct. 497, 500, 79 L.Ed. 1032, 101 A.L.R. 55, may be related to the instant case. Mr. Justice Cardozo likens the attempt by the New York Legislature to fix milk producers' prices in Vermont on a par with those of New York, as a condition of its sale in New York, to customs duties. He says: "Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. Imposts or duties upon commerce with other countries are placed, by an express prohibition of the Constitution, beyond the power of a state, 'except what may be absolutely necessary for executing its inspection Laws.' Constitution, art. 1, § 10, cl. 2. * * * 'It is the established doctrine of this court that a state may not, in any form or under any guise, directly burden the prosecution of interstate business.' International Text-Book Co. v. Pigg, 217 U.S. 91, 112, 30 S.Ct. 481, 487, 54 L.Ed. 678, 27 L.R.A.(N.S.) 493, 18 Ann. Cas. 1103."

To burden the movement of plaintiff's own property with a substantial tax, when that sum bears no reasonable relation to the express use of and cause of the levy, constitutes nothing less than a customs duty. To declare such tax legal as an exception would, to use the apt words of the justice above quoted, "be to eat up the rule under the guise of an exception." Other cases of interest by analogy are Voight v. Wright, 141 U.S. 62, 11 S.Ct. 855, 35 L.Ed. 638; Brimmer v.

928

Rebman, 138 U.S. 78, 11 S.Ct. 213, 34 L.Ed. 862; Webber v. Virginia, 103 U.S. 344, 26 L.Ed. 565.

■ The state cannot exact an arbitrary toll for revenue from any class of highway users. Interstate Transit, Inc., v. Lindsey, supra; Sprout v. City of South Bend, 277 U.S. 163, 169, 48 S.Ct. 502, 72 L.Ed. 833, 62 A.L.R. 45.

Judgment will go for plaintiff. A permanent injunction will issue and the bonds given under the temporary restraining order will be exonerated.

YANKWICH, District Judge.

I dissent.

The main opinion admits that caravaning of automobiles from other states to California has become so extensive as to create a problem. But it denies validity to the California Caravan Act (Statutes of 1935, c. 402, p. 1453, California Vehicle Code, pp. 174–176) for three reasons: (1) That the classification is arbitrary, in that it does not apply to what is strictly speaking caravaning, i. e., fleet movements of cars on their own wheels, but includes a single car transported from without the state of California (as the enactment provides) "on its own wheels, or in tow of another motor vehicle * * * for sale" (St.Cal.1935, p. 1453, § 1); (2) that it is, in reality, a protective tariff against automobiles transported for sale from without the state of California, and thus violative of the commerce clause of the Constitution of the United States (Constitution of the United States, art. 1, § 8); and (3) that the amount of the fee charged for each caravaned automobile is excessive and arbitrary and has no relation to the cost of the added burden upon the state traffic, which might justify the regulation, and is thus violative of the due process and equal protection clauses of the Constitution. Constitution of the United States, Fourteenth Amendment, § 1. Because of the importance of the matter, I state the reasons for my dissent fully. Of necessity, the questions are interrelated. So to a certain extent the principles involved must be treated together.

The power of the Congress to regulate commerce between the states is exclusive and plenary, and is not subject to any state restrictions, burdens, or limitations. Gibbons v. Ogden (1825) 9 Wheat. 1, 70, 6 L.Ed. 23; Board of Trustees of University of Illinois v. United States (1933) 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025. No state may, through the exercise of the taxing or police powers, establish an economic barrier between the states. Baldwin v. G. A. F. Seelig, Inc. (1935) 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55; Bingaman v. Golden Eagle Western Lines, Inc. (1936) 56 S.Ct. 624, 80 L.Ed. ——. However, a state may, in the exercise of its reserved power to regulate intrastate commerce, adopt measures and regulations which affect interstate commerce indirectly and incidentally only, or the persons engaged in it. If such regulations do not impede the free flow of commerce, they will be given validity. See Boston & Maine Railroad v. Armburg (1932) 285 U.S. 234, 52 S.Ct. 336, 76 L.Ed. 729; Clyde Mallory Lines v. Alabama (1935) 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. ——. So statutes which impose a charge for the use of the highways and facilities of a state by residents of other states or interstate carriers have been sustained. The limits of the exercise of this power have been stated by Mr. Justice Brandeis in Interstate Transit v. Lindsey (1931) 283 U.S. 183, 185, 51 S.Ct. 380, 381, 75 L.Ed. 953:

"While a state may not lay a tax on the privilege of engaging in interstate commerce, Sprout v. South Bend, 277 U.S. 163, 48 S.Ct. 502, 72 L.Ed. 833, 62 A.L.R. 45, it may impose even upon motor vehicles engaged exclusively in interstate commerce a charge, as compensation for the use of the public highways, which is a fair contribution to the cost of constructing and maintaining them and of regulating the traffic thereon. Kane v. New Jersey, 242 U.S. 160, 168, 169, 37 S.Ct. 30, 61 L.Ed. 222 [227, 228]; Clark v. Poor, 274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199; Sprout v. South Bend, supra, 277 U.S. [163], 169, 170, 48 S.Ct. 502 [72 L.Ed. 833, 836, 837, 62 A.L.R. 45]. As such a charge is a direct burden on interstate commerce, the tax cannot be sustained unless it appears affirmatively, in some way, that it is levied only as compensation for use of the highways or to defray the expense of regulating motor traffic. This may be indicated by the nature of the imposition, such as a mileage tax directly proportioned to the use, Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551, or by the express allocation of the proceeds of

the tax to highway purposes, as in Clark v. Poor, supra [274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199], or otherwise. Where it is shown that the tax is so imposed, *it will be sustained unless the taxpayer shows that it bears no reasonable relation to the privilege of using the highways or is discriminatory."* (Italics added.)

Some cases intimate that the tax is considered as mere compensation for the damage done to the roads by the driving of automobiles and is based primarily upon the amount of destruction caused by them. Kane v. State of New Jersey (1911) 81 N.J.Law, 594, 80 A. 453, L.R.A.1917B, 553, Ann.Cas.1912D, 237. Notwithstanding this, courts have left it to the Legislatures of the various states to determine the form which the exaction should take. Thus (even in the case of interstate commerce carriers) it may take the form of a fee (Kane v. State of New Jersey [1916] 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222) or of a mileage tax, despite the fact that by the law of the particular state carriers of intrastate commerce are taxed upon the basis of gross receipts. See Interstate Busses Corporation v. Blodgett (1928) 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551. Nor does the fact that such a tax imposed directly upon an interstate carrier may be in addition to an annual license fee demanded of all persons using automobiles make the fee a discriminatory exaction violative of the commerce clause. See Clark v. Poor (1927) 274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199; Interstate Busses Corporation v. Blodgett, supra; American Motor Coach System v. City of Philadelphia (C.C.A.3, 1928) 28 F.(2d) 736; Liberty Highway Company v. Michigan Public Utilities Commission (D.C.1923) 294 F. 703. Indicative of the recent trend of the Supreme Court to sustain local impositions or regulations despite their incidental effect upon interstate commerce is Clyde Mallory Lines v. Alabama (1935) 296 U.S. 261, 56 S.Ct. 194, 197, 80 L.Ed. ——. Despite the constitutional inhibition against the laying of duties on tonnage by the states (Constitution of the United States, art. 1, § 10, cl. 3), the court there sustained a flat harbor fee of $7.50 for vessels of 500 tons and over entering the harbor at Mobile, saying: "And charges levied by state authority to defray the cost of regulation or of *facilities* afforded in aid of interstate or for-eign commerce have consistently been held to be permissible." Clyde Mallory Lines v. Alabama, supra, 296 U.S. 261, at page 267, 56 S.Ct. 194, 80 L.Ed. ——.

In the realm of control of highways, the basis and limit of allowable legislative power is given in Clark v. Poor, supra, 274 U.S. 554, at page 557, 47 S.Ct. 702, 703, 71 L.Ed. 1199:

"The highways are public property. *Users of them, although engaged exclusively in interstate commerce, are subject to regulation by the state to ensure safety and convenience and the conservation of the highways.* Morris v. Duby (No. 372), 274 U.S. 135, 47 S.Ct. 548, 71 L.Ed. 966, decided April 18, 1927; Hess v. Pawloski (No. 263), 274 U.S. 352 [353], 47 S.Ct. 632, 71 L.Ed. 1091, decided May 16, 1927. Users of them, although engaged exclusively in interstate commerce, *may be required to contribute to their cost and upkeep. Common carriers for hire, who make the highways their place of business, may properly be charged an extra tax for such use.* Hendrick v. Maryland, 235 U.S. 610, 35 S.Ct. 140, 59 L.Ed. 385; Kane v. New Jersey, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222. Compare Packard v. Banton, 264 U.S. 140, 144, 44 S.Ct. 257, 68 L.Ed. 596.

"There is no suggestion that the tax discriminates against interstate commerce. Nor is it suggested that the tax is so large as to obstruct interstate commerce. It is said that *all of the tax is not used for maintenance and repair of the highways; that some of it is used for defraying the expenses of the commission in the administration or enforcement of the act, and some for other purposes. This, if true, is immaterial. Since the tax is assessed for a proper purpose and is not objectionable in amount, the use to which the proceeds are put is not a matter which concerns the plaintiffs."* (Italics added.)

Similar language is found in Liberty Highway Company v. Michigan Public Utilities Commission, supra, 294 F. 703, at page 708. In the light of these principles, the imposition of a license tax for the use of the highways of California for caravaning purposes, as defined in the act, is not a restriction upon interstate commerce. The act does not attempt to regulate the sale of automobiles from outside of the state or to impose restrictions upon the manner of their sale—restrictions of the type which Judge Wilbur,

Judge Stephens, and the writer declared invalid in Asher & Ponder v. Ingels (D.C. 1936) 13 F.Supp. 654. Nor is it an attempt to compel the acquisition of a license for carrying on an interstate business. It is true that caravaning of automobiles within the state is not prohibited. But there is no evidence before us to justify the conclusion that the practice obtains to any considerable degree in any case except in the case of automobiles originating outside of the state. And, even if it were shown that caravaning is carried on, without restriction, with automobiles originating within the state, I do not think that the enactment would, for that reason alone, be invalid. We would merely have a case of a special restriction applicable to persons who seek to make the highways of the state the locale for carrying on business enterprises and no more unconstitutionally objectionable than the additional exactions sustained in Clark v. Poor, supra, and Interstate Busses Corporation v. Blodgett, supra. The more so as the act specifically provides (in section 5 of St.Cal.1935, p. 1454) that the fee shall be in lieu of all other registration fees and license fees for the use of the public highways during the 90-day period for which the permits are granted. Clearly a state may, without violating the interstate commerce clause, exact a fee for the use of its highways for commercial purposes by owners of automobiles originating outside of the state in lieu of other exactions which it imposes upon automobiles within the state.

Nor is there, to my mind, any arbitrariness violative of due process involved in the size of the fee.

The cases in which the size of a fee has been held unreasonable have been cases in which the fee demanded was so out of proportion to the avowed purpose for which it was being collected as to shock, as was the case in Interstate Transit v. Lindsey, supra, and Prouty v. Coyne (D.C.S.D.1932) 55 F.(2d) 289; and see Young's Market Co. v. State Board of Equalization (D.C.Cal.1935) 12 F.Supp. 140,[1] and it was clear to the court that the enactments were, in reality, *revenue statutes aiming to tax the right to carry on interstate business.* But these very cases speak for the validity of a reasonable exaction, without requiring demonstration that the amount is just what is

necessary to compensate the state for the use and upkeep of the highways. See Gundling v. Chicago (1900) 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725. As is said in Interstate Transit v. Lindsey, supra, 283 U.S. 183, at page 190, 51 S.Ct. 380, 382, 75 L.Ed. 953: "Being free to levy occupation taxes, states may tax the privilege of doing an intrastate bus business without regard to whether the charge imposed *represents merely a fair compensation for the use of their highways.*" (Italics added.)

The services of the state in allowing its highways to be used and in policing them are none the less a service which benefits all *(including the plaintiff),* because, in certain instances, the benefit *may be* greater to other persons than to him. See Clyde Mallory Lines v. Alabama, supra, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. ——; Aero Mayflower Transit Co. v. Georgia Commission (1935) 295 U.S. 285, 55 S.Ct. 709, 79 L.Ed. 1439. Few cases exist where the exercise of valid power has been nullified by the mere excessiveness of an impost. As said in A. Magnano Co. v. Hamilton (1934) 292 U.S. 40, at page 47, 54 S.Ct. 599, 602, 78 L.Ed. 1109: "If the tax imposed had been 5 cents instead of 15 cents per pound, no one, probably, would have thought of challenging its constitutionality or of suggesting that under the guise of imposing a tax another and different power had in fact been exercised. If a contrary conclusion were reached in the present case, it could rest upon nothing more than the single *premise that the amount of the tax is so excessive that it will bring about the destruction of appellant's business,* a premise which, standing alone, *this court heretofore has uniformly rejected as furnishing no juridicial ground for striking down a taxing act.*" (Italics added.)

In dealing with the subject of classification, in the exercise of the police power, it is well to bear in mind that it is impossible to achieve absolute equality. Nor is such equality necessary in order to insure constitutional validity under the due process and equal protection of law clauses of the Fourteenth Amendment to the Constitution. As said by Mr. Justice Holmes, in Patsone v. Pennsylvania (1914) 232 U.S. 138, 34 S.Ct. 281, 282, 58 L.Ed. 539, in an oft-quoted passage: "*A lack of abstract symmetry does not matter.*

---

[1] The Supreme Court has granted a hearing in the case. 56 S.Ct. 751, 80 L. Ed. ——.

*The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named.*" (Italics added.)

See, also, Radice v. New York (1924) 264 U.S. 292, 44 S.Ct. 325, 68 L.Ed. 690; McCrary v. United States (1904) 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Rast v. Van Deman & Lewis Co. (1916) 240 U.S. 342, 343, 357, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann. Cas.1917B, 455; Miller v. Wilson (1915) 236 U.S. 373, 383, 35 S.Ct. 342, 59 L.Ed. 628, L.R.A.1915F, 829; Heisler v. Thomas Colliery Co. (1922) 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237; Quaker City Cab Company v. Pennsylvania (1928) 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927; People of State of New York ex rel. Bryant v. Zimmerman (1928) 278 U.S. 63, 64, 49 S.Ct. 61, 73 L.Ed. 184, 62 A.L.R. 785; Fox v. Standard Oil Company (1935) 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780; A. Magnano Co. v. Hamilton (1934) 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109; In re Miller (1912) 162 Cal. 687, 124 P. 427; Miller v. Board of Public Works (1925) 195 Cal. 477, 234 P. 381, 38 A.L.R. 1479; Graham v. Kingwell (1933) 218 Cal. 658, 24 P.(2d) 488. These cases show that, in interpreting the exercise of the police or taxing powers, courts have not sought to bind legislative bodies to an abstract or unrealizable ideal of equality. They have insisted merely that there be a reasonable foundation for the classification. When satisfied of its existence, they have sustained it. See St. Louis R. Co. v. Paul (1899) 173 U.S. 404, 19 S.Ct. 419, 43 L.Ed. 746; Petit v. Minnesota (1900) 177 U.S. 164, 168, 20 S.Ct. 666, 44 L.Ed. 716; Williams v. Fears (1900) 179 U.S. 270, 275, 21 S.Ct. 128, 45 L.Ed. 186; Knoxville Iron Co. v. Harbison (1901) 183 U.S. 13, 14, 22 S.Ct. 1, 46 L.Ed. 55; Bosley v. McLaughlin (1915) 236 U.S. 385, 35 S.Ct. 345, 59 L.Ed. 632; Gregg Dyeing Co. v. Query (1932) 286 U.S. 472, 52 S.Ct. 631, 76 L.Ed. 1232, 84 A.L.R. 831; Hicklin v. Coney (1933) 290 U.S. 169, 54 S.Ct. 142, 78 L.Ed. 247; Nebbia v. New York (1935) 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Borden's Farm Products v. Ten Eyck (1936) 56 S.Ct. 453, 80 L.Ed. ——. A study of these and other cases warrants the following conclusion: If a Legislature may, for regulatory purposes, distinguish between barbershop employment and other kinds of labor (Petit v. Minnesota, supra), or between "immigrant agents" engaged in hiring laborers to be employed beyond the limits of a state and persons engaged in the business of hiring for labor within the state (Williams v. Fears, supra), or exclude chambermaids in rooming and lodging houses or women performers in certain places from the provisions of laws regulating the hours of labor of women (Miller v. Wilson, supra; Radice v. New York, supra; In re Miller, supra), or regulate the hours of labor of pharmacists and student nurses and exclude graduate nurses (Bosley v. McLaughlin, supra), or the manner of payment of wages of employees in certain industries only (St. Louis R. Co. v. Paul, supra), if a product, like oleomargarine, may be selected for special taxation so as to discourage its use, in favor of butter (A. Magnano Co. v. Hamilton, supra), if a Legislature may require disclosure of the by-laws and membership of one group of oath-requiring associations *(like the Ku-Klux Klan)*, and not require it of others *(like labor unions or other fraternal organizations)* (People of State of New York ex rel. Bryant v. Zimmerman, supra), if an automobile licensing and tax scheme may exclude automobiles of farmers or others from the exaction (Aero Mayflower Transit Company v. Georgia Commission [1935] 295 U.S. 285, 55 S.Ct. 709, 79 L.Ed. 1439; Hicklin v. Coney, supra), if, in the enforcement of an industrial regulatory measure, an administrative body may apply different rules as to price as between well-advertised dealers and independents, giving a differential to one group and not to the other (Borden's Farm Products v. Ten Eyck, supra), a classification which, so far as known, includes the whole class, should not be stricken down, merely because of the possibility that it might result in inequality in some individual case. There is no evidence in the record that there is any caravaning within the state. And, while it is true that, occasionally, a car may be moved on its own wheels for the purpose of sale within the state, this fact does not militate against the valid-

ity of the classification. Such car, of necessity, would have a California registration and would be moved by employees of the owner or of the buyer and would present none of the dangers of out-of-state transportation. So we have a reasonable factual basis for the classification. See Piper v. Bingaman (D.C.N.M. 1935) 12 F.Supp. 755.

"Of course, the mere fact of classification is not enough to put a statute beyond the reach of the equality provision of the Fourteenth Amendment. Such classification must not be 'purely arbitrary, oppressive or capricious.' American Sugar Refining Co. v. Louisiana, 179 U.S. 89, 92, 21 S.Ct. 43, 45 L.Ed. 102. *But the mere production of inequality is not enough. Every selection of persons for regulation so results, in some degree. The inequality produced, in order to encounter the challenge of the Constitution, must be 'actually and palpably unreasonable and arbitrary.'* Arkansas Natural Gas Co. v. Arkansas Railroad Commission, 261 U.S. 379, 384, 43 S.Ct. 387, 67 L.Ed. 705, and cases cited." Radice v. New York, supra, 264 U.S. 292, at page 296, 44 S.Ct. 325, 327, 68 L.Ed. 690. (Italics added.)

In assaying the classification under discussion, it is well to advert to some of the facts testified to at the hearing which were also before the legislators during the deliberations on the bill. The practice has grown up in the last few years of moving automobiles on their own wheels over the public highways of California to their place of sale. The movement is accomplished by fleets of cars of from eight to thirty or more cars, most of them joined in tandem with two cars driven by one driver. California is a large state with great distances. The caravaning of automobiles has increased traffic hazards and resulted in many law violations and abuses. The abuses were found to exist only among persons who moved cars on their own wheels from without the state for the purpose of sale. To particularize the conditions and some of the abuses: The automobiles are moved in fleets by the tandem-towing method. Usually, there is no taillight on the towed car. The control of the two cars comes from the brakes of the first car. So the towed car may swing or skid or fail to follow the towed car on curves. The driver of the towing car has no clear back vision. The movement in fleets makes it difficult to pass caravans moving on the highway. When, as one officer testified, there is trouble and the caravan is halted, a traffic hazard arises. Many stolen and cars with fraudulent registrations are brought in in this manner. The type of drivers employed complicates the problem. They are usually persons without any permanent residence or visible means of support, driving the car, not as an occupation, but merely for the purpose of obtaining transportation to California. They do not know the traffic laws of California. Conformance means nothing to them, because, once the state is reached, their objective has been attained—the El Dorado has been reached. Because these persons have no permanent residence, giving them a summons to appear means nothing. In many instances, as the testimony showed, the persons cannot later be found. The only other alternative, that of arresting them for violation, makes confusion worse confounded. The officer must leave his place on the highway and take the offender before a magistrate. They drive long hours. Many of them have no places to sleep other than in the cars. They become fatigued and careless. All these facts are very important factors in the happening of accidents. Many of the cars so moved have foreign license plates. Without the Caravan Act, they could move over the highways of the state without registration and without identification. These facts present a serious evil with which the California Legislature sought to deal. The evil was of recent origin. There were no legislative precedents for any other method of combating it. The Legislature sought to remedy it by making a charge for the use of its highways for commercial purposes by persons caravaning automobiles. It defined caravaning as "the transportation from without the State of *any motor vehicle* operated on its own wheels, or in tow of another motor vehicle, for the purpose of selling or offering the same for sale to or by any agent, dealer, manufacturers' representative, purchaser or prospective purchaser, whether such agent, dealer, manufacturers' representative, purchaser or prospective purchaser may be located within or without this State." Section 1, Statutes 1935, c. 402, p. 1453, California Vehicle Code (1935), pp. 174, 175. Had the Legislature sought to exclude single cars op-

erated · on their own wheels or units of one towed car, and confined the enactment to fleets of cars, such a classification might have been more difficult to defend than the present one. This because it might have been shown that all these cars originating out of the state caused the same difficulties, irrespective of the size of the caravan. So the Legislature included *the whole class* which experience had shown brought on the particular evil.

Ours is the duty to stay arbitrary action in the realm of legislation. This duty, however, we must perform in the light of the doctrine laid down by Mr. Justice Roberts in Borden's Farm Products v. Ten Eyck, supra, 56 S.Ct. 453, 456, 80 L.Ed. ——: *"Judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary."* (Italics added.)

In dealing with the exercise of the police power, fairly debatable questions as to "its reasonableness, wisdom, and propriety are not for the determination of courts." Standard Oil Company v. Marysville (1929) 279 U.S. 582, at page 584, 49 S.Ct. 430, 73 L.Ed. 856. Granted that the operation of the enactment may work to the advantage of the dealers in secondhand automobiles who purchase automobiles within the state, it is not a constitutional objection to the exercise of the police power of a state that it may foster the development of one form of business and restrict another. Fox v. Standard Oil Co. (1935) 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780; Sproles v. Binford (1932) 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167; Aero Mayflower Interstate Co. v. Georgia Commission, supra; Hicklin v. Coney, supra.

To my way of thinking, the act contains no discrimination between interstate and intrastate commerce; nor between persons engaged in the same business and operating the same or similar types of vehicles. The act aims to cover only one group shown to exist—a group residing within the state, endeavoring to use the highways of the state for the purpose of caravaning vehicles originating out of the state for sale. There is no evidence to show there are any caravans originating within the state operating either between various points within the state or going out of the state. The only caravan-

ing within the state testified to at the trial was caravaning of automobiles originating outside of the state, in their course, between various points within the state, to their destination. The fee charged is a flat fee, and its size is not such as to warrant the conclusion that it is unreasonable. I am thus unable to see in the enactment the violation of either the commerce or the due process or equal protection clauses of the United States Constitution.

Hence my dissent from my brethren.