**PAUL GRAY, Inc., et al. v. INGELS, Director of Motor Vehicles, et al.**

**Eq. 1203–C.**

District Court, S. D. California, Central Division.

July 9, 1938.

Tripp, Penney & Callaway (by L. E. Tripp and George Penney) and Clarence Eubanks, all of Los Angeles, Cal., for plaintiff.

John O. Palstine, Deputy Atty. Gen. (for U. S. Webb, Atty. Gen.) of State of California, for defendant.

Before WILBUR, Circuit Judge, COSGRAVE and YANKWICH, District Judges.

COSGRAVE, District Judge.

In 1935 the California Legislature passed an act that defined "caravaning" as the transportation from without the state of any motor vehicle operated on its own wheels or in tow of another vehicle for the purpose of sale to or by anyone within or without the state. The act required a special permit for caravaning for which a fee of fifteen dollars for each vehicle was charged. This money was paid into the general fund in the state treasury, "to reimburse the State treasury·for the added expense which the State may incur in the administration and enforcement of this act and the added expense of policing the highways over which such caravaning may be conducted." Stat.1935, pp. 1453, 1454, § 6.

In a suit brought to restrain the enforcement of the act on the ground that it was a forbidden burden on interstate commerce, and an infringement of due process and equal protection enjoyed under the Fourteenth Amendment of the U. S. Constitution, U.S.C.A.Const.Amend. 14, the plaintiffs obtained judgment in a three judge District Court, Morf v. Ingels, D.C., 14 F.Supp. 922, on May 5, 1936. The defendants appealed to the U. S. Supreme Court, where the judgment was affirmed, Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653, on March 1, 1937. In its decision the Supreme Court considered only the contention that the licensing provisions burdened interstate commerce and expressly refrained from considering the question of discrimination against interstate commerce by failure of the act to exact a fee from those engaged in intrastate commerce,

Ingels v. Morf, supra, page 293, 57 S.Ct. page 441. Appellants did not deny that the permit fee burdened interstate commerce, but urged that it was permissible for (a) the use of the highways, (b) the cost of policing the traffic, including the cost of administering the act. The court held (page 294, 57 S.Ct. page 441) that to justify the exaction by a state of a money payment burdening interstate commerce it must affirmatively appear that it is demanded as reimbursement for the expense of providing facilities or of enforcing regulations of the commerce, which regulations are within its constitutional power. Since, under the act, all the license fees were paid into the general fund, and since no part of the general fund is applied to highway purposes, the court concluded that the fees were collected, not for the use of the highways, but for the extra expense of administering the act and policing the traffic, and since the trial court found on sufficient evidence that the fee was excessive for such purpose, the decision of the District Court holding the act invalid was upheld.

In 1937 the California Legislature repealed the 1935 act and passed an entirely new act (Stat.1937, p. 2253), differing in several respects from that of 1935. The license fee is still imposed on vehicles transported on their own wheels for sale. The state is divided into two zones, with the result that each zone contains one of the two principal centers of population, Los Angeles and San Francisco. While a license fee is required in moving cars from one zone to the other, none is required for intrazone movement. A license fee of $7.50 is provided "as compensation for the privilege of using the public highways" of the state, and a like fee "to reimburse the State for expense incurred in administering police regulations pertaining to the operation of vehicles moved." Section 4. One-half of the fees are paid into the Motor Vehicle fund in the state treasury for the support of the Department of Motor Vehicles. In substance, the new act requires a license fee for all vehicles moved on their own wheels for sale from one of the densely populated areas of the state to another and from points outside of the state to points within either of the zones, but does not require a license fee for similar movements between points within each zone. It devotes one-half of the fee to general highway purposes and the remaining one-half to the expense of policing the traffic and enforcing the act.

948.

Plaintiffs in the present action seek to enjoin the enforcement of the 1937 act on the grounds, among others, that it is an excessive burden on interstate commerce; that it unjustly discriminates between interstate and interzone movement of cars on the one hand, and intrazone movement on the other; that there is no reasonable relation between the charges made and the expenditures necessary.

The defendants plead, among other things, that large numbers of cars are moved in units of two coupled together, with a single driver; that drivers bring cars into the state, and are irresponsible, not regular employees, are transients; that the bringing in of a number of cars in single units produces congestion of the highways, increases traffic hazards and increases the cost of the highway maintenance.

It is shown that approximately 15,000 cars are brought into California upon their own wheels for sale annually. Of this number, 3000 are brought in singly, that is each car with its driver and not in association with any others—not in convoys. 6,000 are moved singly, each car with a single driver, but in convoys of varying numbers, possibly ten to twenty. 6,000 are moved in twos, the rear car being coupled to the one in front with one driver to each such unit. The interzone moving is negligible. 'At the two centers of population and distribution, San Francisco in the northerly zone, and Los Angeles in the southerly zone, there is, of course, extensive sale of cars not brought into the state on their own wheels. These are distributed over an average radius of perhaps a hundred miles from each of the centers, rarely coupled together, but nevertheless in convoys and generally each car is in charge of a driver regularly employed. Distribution is also made by loading the cars on trucks that exceed in length the coupled car unit.

A general comparison between the year 1931 and the year 1937 shows:

|  | 1931 | 1937 |
|---|---|---|
| Total registrations in California | 2,107,275 | 2,638,150 |
| Cars of outside registry coming into the state | 324,726 | 504,943 |
| Total number driven into the state | 649,245 | 1,015,886 |

From this it appears that the 15,000 cars brought in for sale on their own wheels are not to exceed 1½% of the total number of cars coming over the border in 1937. The 3,000 cars brought in, each with its own driver and not in association with other cars, necessarily must be eliminated for it cannot be that they present anything in the nature of a problem. The remaining 12,000 cars come in convoys, say averaging 15 cars to a convoy, or 800 different processions of 15 cars each during the 365 days of the year. This is an average of 66 convoys each month over a distance that can be attained without undue haste in one day. Over a considerable portion of the distance, notably from points of entry at Yermo, Blythe, and Yuma, while the road is a two lane highway, it traverses great lengths of totally uninhabited country with no intersecting roads and with nothing in the way of congested traffic.

15,000 cars means 1½% of the total of 1,015,886 cars that cross the state borders. The testimony as to the number of men whose employment caravaning requires is indefinite and inconclusive. No one on behalf of defendants testified that caravans are actually escorted, with the exception of Captain Personius, who, while stating that he himself had gone from Truckee to Sacramento with caravans, did not know how many caravans had been assisted in his district. Mr. Cato, chief of the patrol, does not say that a single officer or employee devotes his entire time to the caravaning problem. At the most only Captain Personius and possibly two district officers do so. On the other hand, one of the plaintiffs testified that at no time was any of his considerable number of caravans ever escorted or assisted by a traffic officer. It was agreed that many other witnesses would give similar testimony.

The officer charged with the enforcement of the act testifies that after the enactment of the law three officers were assigned to Highway 50 between Carson City, Nevada, and Placerville, California, south of Lake Tahoe. At the same time defendants present the records of the Public Service Commission of the State of Nevada, from which it appears that during the entire eight months, beginning with January 1, 1937, and ending with August 31 of the same year, the period of greatest activity, a total of only 9 cars were brought into California for sale over Highway 50. These undisputed figures put in grave doubt the question as to whether substantial traffic problems exist by reason of caravaning.

The showing made by defendants as to the traffic problems presented by caravaning is not impressive. The number of caravaned cars compared with the total coming into the state, a negligible percentage, seems to force the conclusion that the situation presented is substantially that found by the District Court to exist in the former case, Morf v. Ingels, D.C., 14 F.Supp. 922, that is, that the fee is not fixed on any basis of compensation for the regulation of the traffic.

There is practically no interzone movement. The intrazone movement of cars for sale is approximately 4,000 monthly in Zone 1. While no figures were presented, the movement in Zone 2 may be deemed to be the same. Such cars are entirely untaxed. A tax, purporting to be for the privilege of using the public highways, of $7.50 is exacted with respect to every car brought in for sale on its own wheels, while no tax whatever is levied on those brought in otherwise. Those moved for sale from the point of distribution to points of sale within a zone are untaxed. While some of the features attending the so-called caravaning are absent, nevertheless, such cars are often moved in convoys with regularly employed drivers as distinguished from those casually employed. In many cases the cars are loaded on trucks that themselves exceed the length of two connected cars. They are transported through distinctly congested districts, and for considerable distances. Altogether, it is difficult to distinguish between the two systems of transportation.

The creation of the two zones, there being no interzone movement, is highly suggestive of an effort to create a distinction where none in fact exists. The effect of the act is to lay a tax for the privilege of using the highway on 15,000 cars brought in from other states on their own wheels and at the same time relieve at least five times that number from the payment of the tax that use the public highways under substantially similar conditions within the state, but which do not happen to be brought in on their own wheels.

A tax somewhat similar was upheld in Morf v. Bingaman, 298 U.S. 407, 56 S.Ct. 756, 80 L.Ed. 1245. Such tax was levied, however, upon all automobiles transported for sale, whether intrastate or interstate. While the act attempts by creating zones to remove this objection, that attempt is plainly ineffectual, there being no interzone movement, and the result is that a fee of $7.50 is exacted for the privilege of bringing the car from the state line to the point of distribution. In California, with a registration of 2,638,150 cars, this provision is nothing but discriminatory. In passing on the 1935 act, the Supreme Court expressly declined to pass upon this question. Ingels v. Morf, supra, page 293, 57 S.Ct. page 441. A regulation that made a distinction between those who carry farm products for hire and those who carry other commodities has been condemned as an arbitrary distinction by the Supreme Court, Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264. Since public safety was the ultimate object, the distinction was held to be discriminatory, as not based on anything having relation to the purpose for which it was made (page 567, 51 S.Ct. page 587). The same condition seems to exist here.

The Tennessee statute considered in Interstate Transit, Inc., v. Lindsey, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953, was held invalid because it was evident that the tax was laid for the privilege of doing business and not a compensation for the use of the highways. The tax, laid on interstate busses, was defended as a reasonable compensation for the use of the highways. The Court uses what appears to be quite pertinent language: "But since a State may demand of one carrying on an interstate bus business only fair compensation for what it gives, such imposition, although termed a tax, cannot be tested by standards which generally determine the validity of taxes. Being valid only if compensatory, the charge must be necessarily predicated upon the use made, or to be made, of the highways of the state. Clark v. Poor, supra [274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199]. In the present act the amount of the tax is not dependent upon such use. It does not rise with an increase in mileage traveled, or even with the number of passengers actually carried on the highways of the state. Nor is it related to the degree of wear and tear incident to the use of motor vehicles of different sizes and weights, except in so far as this is indirectly affected by carrying capacity. The tax is proportioned solely to the earning capacity of the vehicle. Accordingly, there is here no sufficient relation between the measure employed and the extent or manner of use to justify holding that the tax was a charge made merely as compensation for the use of the highways by interstate busses." Page 190, 51 S.Ct. page 382.

950

Even in South Carolina State Highway Department v. Barnwell Brothers, Inc., et al., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. ——, decided on February 14, 1938, the Supreme Court seriously discusses the question whether a state, in regulating the width of trucks used in interstate commerce, may not have laid an undue burden on such commerce. So long as the regulation was not discriminatory it was upheld.

"The nature of the authority of the state over its own highways has often been pointed out by this Court. It may not, under the guise of regulation, discriminate against interstate commerce. But, 'In the absence of national legislation especially covering the subject of interstate commerce, the state may rightly prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, *applicable alike to vehicles moving in interstate commerce and those of its own citizens.*' Morris v. Duby, 274 U.S. 135, 143, 47 S.Ct. 548, 549, 71 L.Ed. 966. * * * This Court has often sustained the exercise of that power, although it has burdened or·impeded interstate commerce. It has upheld weight limitations lower than those presently imposed, *applied alike to motor traffic moving interstate and intrastate.* Morris v. Duby, supra; Sproles v. Binford, supra [286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167]." (58 S.Ct. page 515.) (Italics supplied.)

Are we not compelled, following Morf v. Ingels, supra, to grant the injunction?

██ On the whole, it is evident that the employment of any considerable number of traffic officers to overcome problems presented by the entry of 12,000 automobiles, 6000 in twos, and the other 6,000 each with its own driver, presents no problem justifying the expenditure of a tax equaling $112,500, nor can a charge of $7.50 for the use of the highway be justified with respect to each car transported for sale when it comes from outside of the state, while nothing is charged under similar conditions within the state unless a car happens to be taken from one of the densely populated areas to the other. The situation presented seems to bring this statute within the language of the Supreme Court in passing upon the statute of the State of Washington that imposed a tax upon common carriers, decided at the same time as Morf v. Ingels, supra: "A law exhibiting the intent to impose a compensatory fee for such a legitimate purpose [regulation and inspection of public utilities] is prima facie reasonable. If the exaction be so unreasonable and disproportionate to the service as to impugn the good faith of the law it cannot stand either under the commerce clause or the Fourteenth Amendment." Great Northern Railway Co. v. Washington, 300 U.S. 154, 160, 57 S.Ct. 397, 400, 81 L.Ed. 573.

The permanent injunction is granted.

YANKWICH, District Judge (dissenting).

I dissent.

The California Caravan Act of 1937 (Cal.Stats.1937, Ch. 788, p. 2253) having been passed to supplant the Caravan Act of 1935, St.1935, p. 1453, voided by the courts (Morf v. Ingels, 1936, 14 F.Supp. 922; Ingels v. Morf, 1937, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653), the challenge to it must be considered in the light of the postulate that the legislative body sought by the new Act to overcome the infirmities of the old Act. United States v. Bekins, 1938, 58 S.Ct. 811, 82 L.Ed. ——. Both Acts aim to control highway transportation within the state. The power of a state so to do is beyond challenge. Its exercise would be upheld even though it impeded or burdened interstate commerce. The Supreme Court has said so repeatedly. As recently as February 14, 1938 (South Carolina State Highway Department v. Barnwell Bros., Inc., 1938, 303 U.S. 177, 189, 58 S. Ct. 510, 516, 82 L.Ed. ——) it said: "This Court has often sustained the exercise of that power [*state control over highways*], although it has burdened or impeded interstate commerce. It has upheld weight limitations lower than those presently imposed, applied alike to motor traffic moving interstate and intrastate. Morris v. Duby [274 U.S. 135, 47 S.Ct. 548, 71 L.Ed. 966]; Sproles v. Binford [286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167]. Restriction favoring passenger traffic over the carriage of interstate merchandise by truck has been similarly sustained, Sproles v. Binford [286 U. S. 374, 52 S.Ct. 581, 76 L.Ed. 1167]; Bradley v. Public Utilities Commission of Ohio, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053, 85 A.L.R. 1131, as has the exaction of a reasonable fee for the use of the highways. Hendrick v. Maryland, 235 U.S. 610, 35 S. Ct. 140, 59 L.Ed. 385; Kane v. New Jersey, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222; Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551; Morf v. Bingaman [298 U.S. 407, 56 S.Ct. 756, 80 L.

Ed. 1245]; cf. Ingels v. Morf, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653." What is, however, forbidden, in the exercise of this power, is discrimination against interstate commerce, under the guise of regulation. Interstate Transit, Inc., v. Lindsey, 1931, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953.

One of the indirect aims of the Act under attack is to control certain automobile traffic which originates outside of the State. I am of the view that this result is achieved without discrimination against interstate commerce.

Instead of imposing (as did the Act of 1935) a fee on caravaning originating without the state, the new Act requires the payment of two license fees for the caravaning of automobiles between two zones within the state, whether the movement originates within or without the state. Each fee is $7.50 in amount. One is imposed "as compensation for the privilege of using the public highways." Section 4 of the Act. The money derived from this fee is payable into the State Highway Fund [Section 7 of the Act] which is reserved for moneys used for the acquisition of rights-of-way and the construction, maintenance and improvements of state highways. Cal.Stats.1935, Ch. 29, p. 265, secs. 182, 183. The other fee is "to reimburse the State for expense incurred in administering police regulations pertaining to the operation of vehicles moved pursuant to such permits and to public safety upon the highways as affected by such operation." Section 4 of the Act. Similar declarations of purpose are contained in Section 7 of the Act.

The permit, issued upon the payment of the fees, is valid for six months and is in lieu of any other registration or license fee or charge during this period, in which the caravaned car may be driven over the highways of the state for the purpose of sale or exchange. Section 6 of the Act.

The form which regulation of the traffic on state highways may take without impinging upon the commerce clause of the Constitution of the United States has been stated, generally, by Mr. Justice Brandeis in Interstate Transit, Inc., v. Lindsey, 1931, 283 U.S. 183, 185, 51 S.Ct. 380, 381, 75 L.Ed. 953:

"While a state may not lay a tax on the privilege of engaging in interstate commerce, Sprout v. South Bend, 277 U.S. 163, 48 S.Ct. 502, 72 L.Ed. 833, 62 A.L.R. 45, it may impose even upon motor vehicles engaged exclusively in interstate commerce a charge, as compensation for the use of the public highways, which is a fair contribution to the cost of constructing and maintaining them and of regulating the traffic on them. Kane v. New Jersey, 242 U.S. 160, 168, 169, 37 S.Ct. 30, 61 L.Ed. 222; Clark v. Poor, 274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199; Sprout v. South Bend, supra, pages 169, 170, of 277 U.S., 48 S.Ct. 502. As such a charge is a direct burden on interstate commerce, the tax cannot be sustained unless it appears affirmatively, in some way, that it is levied only as compensation for use of the highways or to defray the expense of regulating motor traffic. This may be indicated by the nature of the imposition, such as a mileage tax directly proportioned to the use, Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551, or by the express allocation of the proceeds of the tax to highway purposes, as in Clark v. Poor, supra, or otherwise. Where it is shown that the tax is so imposed, it will be sustained *unless the taxpayer shows that it bears no reasonable relation to the privilege of using the highways or is discriminatory.* Hendrick v. Maryland, 235 U.S. 610, 612, 35 S.Ct. 140, 59 L.Ed. 385; Interstate Busses Corp. v. Blodgett, 276 U.S. 245, 252, 48 S.Ct. 230, 72 L.Ed. 551; Compare Interstate Busses Corp. v. Holyoke Street Ry. Co., 273 U.S. 45, 51, 47 S.Ct. 298, 71 L.Ed. 530." (Italics added)

The following cases indicate the variety of forms of regulations so sustained: Hendrick v. Maryland, 1915, 235 U.S. 610, 35 S. Ct. 140, 59 L.Ed. 385 *(graduated license fee and requirement of non-resident to appoint agent);* Packard v. Banton, 1924, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596 *(statute limited to cities of first class, requiring persons engaged in carrying passengers for hire in motor vehicles upon public streets to file security or insurance for payment of judgments for death or injury);* Morris v. Duby, 1927, 274 U.S. 135, 47 S.Ct. 548, 71 L.Ed. 966 *(state order limiting maximum weight of motor trucks and loads on highways);* Clark v. Poor, 1927, 274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199 *(statute requiring extra tax on motor carriers);* Interstate Busses Corp. v. Blodgett, 1928, 276 U.S. 245, 48 S.Ct. 230, 72 L.Ed. 551 *(a state tax of one cent for each mile of highway traversed by a motor bus used in interstate commerce, in addition to other taxes imposed on owner in the absence of "a showing that in actual practice the tax of which it complains falls with disproportionate economic weight on*

*it");* Sproles v. Binford, 1932, 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167 *(à statute* [Vernon's Ann.P.C.Tex. art. 827a] *limiting the net load of trucks);* Stephenson v. Binford, 1932, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721 *(statute* [Vernon's Ann. Civ.St.Tex. art. 911b] *regulating carriers on highways and their rates)*; Continental Baking Co. v. Woodring, 1932, 286 U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155, 81 A.L.R. 1402 *(license fee and tax on carrier of goods by motor);* Morf v. Bingaman, 1936, 298 U.S. 407, 56 S.Ct. 756, 80 L.Ed. 1245 *(a flat tax on caravaning automobiles);* South Carolina State Highway Dept. v. Barnwell Bros., Inc., 1938, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. —— *(statute prohibiting the use on the highway of trucks exceeding certain length and weight);* George B. Wallace, Inc., v. Pfost, 1937, 57 Idaho 279, 65 P.2d 725, and annotations thereto in 110 A.L.R. 622 *(fee on caravaning automobiles)*. See also Clyde Mallory Lines v. Alabama ex rel., 1935, 296 U.S. 261, 56 S.Ct. 194, 80 L. Ed. 215, in which a uniform harbor fee for vessels of certain tonnage was sustained, in the face of the constitutional inhibition against laying of duties on tonnage by the states. Constitution of United States, Article 1, Sec. 10, cl. 3, U.S.C.A.Const. art. 1, § 10, cl. 3.

The final decision on the prior Act (Ingels v. Morf, 1937, 300 U.S. 290, 57 S.Ct. 439, 81 L.Ed. 653) did not turn upon classification. The Act was denied judicial sanction because the fee exacted was found to be excessive. The opinion also declares that the burden of proving that the fee is excessive rests with him who attacks it. If he does not show that it exceeds a reasonable charge for the privilege of using the highway or for defraying the cost of regulating the traffic involved, his attack must fail. See, Morf v. Bingaman, 1936, 298 U. S. 407, 56 S.Ct. 756, 80 L.Ed. 1245.

In passing upon an attack of this character, courts disregard the fact that all the money collected as a charge may not actually be used, or be necessary for that purpose. Gundling v. Chicago, 1900, 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725; Clark v. Poor, 1927, 274 U.S. 554, 47 S.Ct. 702, 71 L.Ed. 1199; Interstate Transit, Inc., v. Lindsey, 1931, 283 U.S. 183, 51 S.Ct. 380, 75 L.Ed. 953. Nor is it material that the litigant attacking the bill may not actually ask or receive the service for which a fee is charged. Clyde Mallory Lines v. Alabama ex rel., 1935, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215.

These principles are expressions of sound judicial polity. Courts, in exercising the power to nullify an exaction as an unreasonable burden upon interstate commerce, should not be placed in a position of requiring a sovereign state to prove, *in dollars and cents,* that the exaction it makes is the exact equivalent of the damage which the particular trip may occasion to the state highway. Kane v. New Jersey, 1916, 242 U.S. 160, 167, 168, 37 S.Ct. 30, 61 L.Ed. 222.

If the facts in the record are tested by these rules, they fail to show that the exactions of the 1937 Caravan Act are onerous or invalid.

There is no showing that the exaction of a fee of $7.50 for the use of the state highway is excessive. The cases discussed have approved a flat charge, comparing it with the old flat toll charge for the use of bridges.

Certain it is that it is not up to the State of California to show that every one of these automobiles transported for business purposes does damage in that amount to the highway.

Bear in mind that the imposition, whether in the form of a tax or of a fee, is "not on *the use* of the highways but on *the privilege of using them."* Morf v. Bingaman, 1936, 298 U.S. 407, 412, 56 S.Ct. 756, 758, 80 L. Ed. 1245. When this is the case, "it is immaterial whether the state places the fees collected in the pocket out of which it pays highway maintenance charges or in some other." Morf v. Bingaman, 1936, 298 U.S. 407, 412, 56 S.Ct. 756, 758, 80 L.Ed. 1245. And the Supreme Court has declined to invalidate an exaction, even when it was actually shown that the fund created by it exceeded what was needed for the particular purpose. Kane v. New Jersey, 1916, 242 U.S. 160, 37 S.Ct. 30, 61 L.Ed. 222; and see, Territory of New Mexico ex rel. E. J. McLean & Co. v. Denver & Rio Grande R. R. Co., 1906, 203 U.S. 38, 55, 27 S.Ct. 1, 51 L.Ed. 78.

Nor does the evidence in the record warrant the conclusion that the fee of $7.50 for added police protection and the maintenance of safety caused by this particular form of traffic is excessive or unreasonable. The problem which caravaning presents, appears from the testimony of E. Raymond Cato, Superintendent of the California

Highway Patrol, whose duties are to administer the affairs of the patrol, lay plans and direct the enforcement of the motor vehicle laws of the state and other laws regulating the operation of motor vehicles upon the highways of the state. The problem was called to his attention in 1931 and 1932. Committees of citizens called on him and asked that caravaning stop. They complained that the caravans were a hazard on the highways. Wrecks caused by them were reported. There were numerous complaints from motorists being crowded off the highways. Because there was no law to stop the traffic, an investigation was made to determine what the problem was, in order that legislation might be recommended to meet it. This investigation and Cato's subsequent observations disclosed that there were many automobiles being driven and towed into the state for the purpose of sale. These fleets and caravans ranged from three and four to sixty or seventy cars. Some of the persons caravaning cars brought them into the state for resale by themselves either at wholesale or retail. Others engaged exclusively in caravaning automobiles for others. The observed caravans ran train-like, i. e., they would remain close together in a group or fleet. Often, by remaining close to each other, the cars in such fleets would not permit traffic going in the same direction to pass a single car in the fleet and thus interrupt the continuity of the fleet. This would cause an additional traffic hazard when vehicles attempted to pass the entire fleet resulting, in many instances, in head-on collisions, side-swiping and upsets. On the open highways, the fleet would not usually drive at the maximum speed allowed—forty-five miles per hour—as resident drivers do, but would drive at a slightly slower speed.

In general, the larger the caravan, the slower the speed would be at which it was driven. This would make it necessary for more cars to pass such fleets than would have occasion to pass the ordinary traffic. Many of the cars in the fleets were in units of two grouped together by tow-bars or other means, each unit being in charge of a single driver who operated the forward car, thus controlling the movement of both cars by use of the mechanism and brakes of the towing car. The drivers of the cars brought into the state for the purpose of sale were not regularly employed in such occupation. Many of them were under eighteen years of age. They were usually engaged casually at the point where the transportation began and served without pay or for a small remuneration, bearing their own expenses in order to secure transportation to the point of destination. They had little or no interest in the vehicles which they were driving or in their employment other than as a means of transportation. They displayed less regard than other drivers for traffic regulations and for the safety and convenience of others using the highway. By the time they reached the state, they were usually in a nearly exhausted physical condition and in a hurry to reach their destination in California. In many instances, when a driver was involved in an accident, or in an unusual delay, or had reached a point where he was satisfied to leave the caravan, he abandoned his vehicle on, or dangerously near, the highway unattended, to the hazard and inconvenience of the users of the highways.

Most of the cars caravaned into the state for sale were and are driven over United States Highways 80, 99, 60, 66, 91, 50, 395, 40, and also on California Highway Route 168. Most of these highways are, for the greater part of their length, two-lane highways traversing routes which have numerous curves both horizontal and vertical and grades in the road and which pass through numerous small towns which they serve as main streets and as their only through streets.

The number of caravaned cars transported for sale increased greatly from 1931 to 1936. Approximately 14,000 cars were caravaned during each of the years 1935 and 1936. In 1937, following the adoption of the California Caravan Act, the volume of the traffic decreased materially. The conditions, both as to the operation and hazards and the personnel, were before the California legislatures of 1935 and 1937, which sought to deal with the problem, and have continued unchanged to the present time. They warrant the special treatment of the problem through this type of legislation. They are akin to the conditions which the court found in Morf v. Bingaman, 1936, 298 U.S. 407, 411, 56 S.Ct. 756, 758, 80 L.Ed. 1245, when it said: "There is ample support for a legislative determination that the peculiar character of this traffic involves a special type of use of the highways, with enhanced wear and tear on the roads and augmented hazards to other traffic, which

imposes on the state a heavier financial burden for highway maintenance and policing than do other types of motor car traffic. We cannot say that these circumstances do not afford an adequate basis for special licensing and taxing provisions, whose only effect, even when applied to interstate traffic, is to enable the state to police it, and to impose upon it a reasonable charge, to defray the burden of this state expense, and for the privilege of using the state highways."

Prior to the development of the caravan method of transporting cars for sale, there was practically no fleet movement of cars upon the highways of California. There still is practically no fleet movement of cars on highways other than in connection with the transportation of cars for sale.

There is definite evidence to show that the safest way to handle the traffic is to assign traffic officers for the purpose of accompanying and convoying each fleet to its destination. The reason why it is not done generally now is the absence of funds. A system of general convoying would require a total of thirty-six officers to handle the caravaning on the main highways leading to the metropolitan areas of California. This not being possible at the present time, the department has attempted to solve the problem by providing additional highway patrolmen upon the highways over which such operations are usually or are likely to be carried on.

These statements as to the actual needs are confirmed by others, and especially by the testimony of Earl W. Personius, Captain of the Highway Patrol in charge of the enforcement of the caravan law in Zone No. 2.

Thirty men have actually been placed upon the various highways, who are needed to handle the traffic situation caused by caravaning and to enforce the Act. Three men have been assigned to investigate registrations suspected of caravaning into the state of California for the purpose of sale and on which the caravan license was not paid. Additional men performing administrative functions at the border patrol station have had to be supplied. Additional clerical assistance has also been required at the Sacramento office of the Division of Registration of the Department of Motor Vehicles made necessary by the additional administrative functions. To this must be added increased supplies and transportation for the men.

On the basis of an average of 14,000 caravaned motor vehicles per year, the income of the state from the tax collected to reimburse it for this policing would amount to $104,000 a year. Without making a detailed computation, I am satisfied that the cost to the state, without taking into consideration expanding future needs, approximates that amount.

It is true that the computations are not exact. By their very nature, they cannot be. Unless we resort to one of those highly complicated cost accounting systems in vogue in large industrial plants, it is difficult, if not impossible, to estimate definitely the time which each officer actually devotes to the problems caused by caravaning. This is especially true when the attack is made, as here, *shortly after a statute goes into effect.* When this is the case, it is *"impossible then to determine whether the fees would prove to be in excess of the administrative requirement, and in this situation it is sufficient if it is shown that the charges are not unreasonable on their face.* As was said in Patapsco Guano Co. v. Board of Agriculture, 171 U.S. 345, 354, 18 S.Ct. 862, 43 L.Ed. 191, 'If the receipts are found to average largely more than enough to pay the expenses, the presumption would be that the legislature would moderate the charge.'" Bourjois, Inc., v. Chapman, 1937, 301 U.S. 183, 187, 57 S.Ct. 691, 694, 81 L.Ed. 1027. (Italics added.)

When an Act is challenged on this ground, all that need be shown is that there was warrant in fact, for the imposition of the particular exaction. In determining this, we must, in the end, rely, as, no doubt, *the Legislature did,* upon the opinion of those charged with the enforcement of the motor vehicle laws of the state as to what additional personnel was necessary to meet the problem and as to the time which others, now otherwise employed, must devote to the duties flowing from the enforcement of this Act. A comparison of the number of automobiles in this traffic with the whole number on the state's highways leads nowhere. The problem created is special and unrelated to mere numbers. Nor can we, in dealing with a traffic movement of this character, set it apart and try to trace directly every one of its effects. We must consider the *gestalt,* or the configuration, which is formed by the entire traffic problem which this particular traffic movement helps complicate, and we must assume that the leg-

islature did so in determining upon the particular legislation. The facts creating the problem were placed before the legislature, before the Act was passed. The facts relating to the expenditures traceable to the enforcement of the Act since its enactment are before us. The legislature, in setting the fee, could but approximate the cost from the nature of the problem as it then existed. The evidence in the record warrants the conclusion that it approximated correctly, and that the fee of $7.50 is not excessive, but is a reasonable compensation to reimburse the state for the additional expenditure it has incurred in attempting to handle the administrative and police problems which this form of traffic has created.

The burden of proving the contrary is upon the plaintiff. See: Hendrick v. Maryland, 1915, 235 U.S. 610, 624, 35 S.Ct. 140, 59 L.Ed. 385; Interstate Busses Corp. v. Blodgett, 1928, 276 U.S. 245, 251, 48 S. Ct. 230, 231, 72 L.Ed. 551; Ingels v. Morf, supra, at page 294, 57 S.Ct. at page 441. If

—because of the generality of certain statements by enforcing officers, caused by the absence of a definite method of measuring the allocation of every item of money which may be derived from this source—we strike down the statute, we would change the burden of proving excessiveness, now lying on him who attacks a statute into the burden of proving the contrary and shift it to the state.[1]

In approaching legislation of this character, we should bear in mind that "The judicial function, under the commerce clause, Const. art. 1, § 8, cl. 3, as well as the Fourteenth Amendment, stops with the inquiry whether the state Legislature in adopting regulations such as the present has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought." South Carolina State Highway Dept. v. Barnwell Bros., Inc., 1938, 303 U.S. 177, 190, 58 S.Ct. 510, 516, 82 L.Ed. ——.

Little need be said on the alleged discrimination between intra-zone and inter-

[1] In Great Northern R. Co. v. Washington, 1936, 300 U.S. 154, 57 S.Ct. 397, 81 L.Ed. 573, from which the main opinion quotes, there is the following statement which would seem to place on the state the burden of proving the reasonableness of the charges:

"The court thought the plaintiff had the burden of showing that the sums exacted from rail carriers substantially exceeded the amounts expended for regulation and supervision, and the proofs offered were insufficient to shift the burden to the defendant. *This view was erroneous.* Foote & Co. v. Stanley, 232 U.S. 494, 34 S.Ct. 377, 58 L.Ed. 698." (Page 162, 57 S.Ct. page 401.) (Italics added.)

The opinion was by a divided court. The minority opinion written by Mr. Justice Cardozo and concurred in by The Chief Justice, and Justices Brandeis and Stone, insisted that the burden is the other way:

"*Still the burden is on the railroads to satisfy the court that what was contributed by them was more than what was expended for their account, since otherwise the common pot may have been a help and not a hurt.* That burden was not discharged. Far from being discharged, there was a disclaimer of any attempt or purpose to discharge it. And so the case must fail." (Pages 168, 169, 57 S.Ct. page 404.) (Italics added.)

Even if the majority opinion be taken as controlling, the case is clearly distinguishable. The court there was deal-

ing with a state tax levied *directly* on interstate carriers, to cover state inspection and supervision. In other words, the court was dealing with a *direct levy* on interstate commerce. Here we are dealing with a levy *primarily* intrastate, which *may* affect interstate commerce only indirectly. When this is the case, the burden to prove excessiveness is always on those who challenge the levy. It never shifts. Great Northern R. Co. v. Washington, supra, was decided on February 1, 1937. On April 26, 1937, the Supreme Court in Bourjois, Inc., v. Chapman, 1937, 301 U.S. 183, 187, 188, 57 S.Ct. 691, 694, 81 L.Ed. 1027, *speaking unanimously,* through Mr. Justice Brandeis, who had been one of the dissenters in the former case, distinguished it in the manner just stated, saying:

"Here, the statute operates *directly only upon intrastate commerce. Where interstate commerce is only indirectly affected, it rests upon one challenging the legislation to show actual undue burden upon such commerce.* See Pacific Telephone & Telegraph Co. v. Tax Commission, 297 U.S. 403, 56 S.Ct. 522, 80 L. Ed. 760, 105 A.L.R. 1. The mere fact that the fees imposed might exceed the cost of inspection is immaterial." (Italics added.)

However, I am of the view that even if the burden is on the state to show that the exactions under this statute are not excessive, it has met it.

zone caravaning and between inter-zone caravaning and non-resident automobilists who may enter the state without the payment of a caravaning license.

It is *no one's* privilege to use state highways for private gain. They are, as the Supreme Court said in Stephenson v. Binford, pages 251, 264, 53 S.Ct. page 184: "public property; that their primary and preferred use is for private purposes; and that their use for purposes of gain is special and extraordinary, which, generally at least, the legislature may prohibit or condition as it sees fit."

The non-resident automobilists, if they come to California, do so for business or pleasure, or as prospective residents. Tourism is a great California industry. The benefits which the state derives from non-resident automobilists coming to the state, would warrant their being placed in a class by themselves and having extended to them the privilege of the use of the state's highways upon conditions different from those extended to persons driving over the highways of the state caravaned automobiles for sale. The caravaning of automobiles within a particular zone is done chiefly by large automobile manufacturers and is performed by regular employees who are residents of the state. The fact that caravaned automobiles are manned by persons, who, in most instances, perform the act of caravaning for the specific occasion of a specific sale—that, in many instances, the drivers are not residents of the state—furnishes a sufficient foundation for a distinct classification. There is more ground for a distinction based upon the casual character of the employment and of the type of persons employed, than there is in distinguishing, for licensing purposes, itinerant merchants from regular merchants, a classification which has been upheld uniformly. See, Emert v. Missouri, 1895, 156 U. S. 296, 15 S.Ct. 367, 39 L.Ed. 430; Baccus v. Louisiana, 1914, 232 U.S. 334, 34 S.Ct. 439, 58 L.Ed. 627; Ex parte Gilstrap, 1915, 171 Cal. 108, 152 P. 42, Ann.Cas.1917A, 1086.

There is no hard and fast constitutional rule by which classifications can be judged. Only those manifestly arbitrary will be denied sanction.

As said by Mr. Justice Sutherland in Bayside Fish Co. v. Gentry, 1936, 297 U.S. 422, 429, 56 S.Ct. 513, 516, 80 L.Ed. 772: "It never has been found possible to lay down any infallible or all-inclusive test by the application of which it may be determined whether a given difference between the subjects of legislation is enough to justify the subjection of one and not the other to a particular form of disadvantage. A very large number of decisions have dealt with the matter; and the nearest approach to a definite rule which can be extracted from them is that, while the difference need not be great, the classification must not be arbitrary or capricious, but must bear some just and reasonable relation to the object of the legislation. *A particular classification is not invalidated by the Fourteenth Amendment merely because inequality actually results. Every classification of persons or things for regulation by law produces inequality in some degree; but the law is not thereby rendered invalid* (Atchison, T. & S. F. R. Co. v. Matthews, 174 U.S. 96, 106, 19 S.Ct. 609, 43 L.Ed. 909), *unless the inequality produced be actually and palpably unreasonable and arbitrary*. Arkansas Natural Gas Co. v. Railroad Commission, 261 U.S. 379, 384, 43 S.Ct. 387, 67 L.Ed. 705, and cases cited." (Italics added.)

And see, Joseph S. Finch & Co. v. McKittrick, D.C.Mo.1938, 23 F.Supp. 244:

The sporadic as distinguished from the permanent use of a highway, the occasional as contrasted with the regular engagement in transportation, and the personal as differentiated from the commercial use of a highway, have been sanctioned as constitutionally valid criteria in establishing classifications. Illustrative are the following: An act differentiating between a common carrier operating over regular routes between fixed termini and other carriers (Bekins Van Lines v. Riley, 1929, 280 U.S. 80, 50 S.Ct. 64, 74 L.Ed. 178); an ordinance requiring that persons engaged in the business of letting out automobiles to be driven by others pay a license fee and deposit an insurance policy for the protection of persons and property against negligent operations by the lessees and not making a similar requirement from others (Hodge Drive-It-Yourself Co. v. Cincinnati, 1932, 284 U.S. 335, 52 S.Ct. 144, 76 L.Ed. 323); an ordinance taxing motor carriers on the basis of gross ton miles, but exempting those operating wholly within a city or village and private carriers (Continental Baking Co. v. Woodring, 1932, 286 U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155, 81 A.L.R. 1402); a statute imposing an annual license fee on private carriers by motor vehicle and exempting vehicles engaged in hauling farm products

between certain points, and agricultural and dairy products owned by producers (Aero Mayflower Transit Co. v. Georgia Public Service Commission, 1935, 295 U.S. 285, 55 S.Ct. 709, 79 L.Ed. 1439); a statute imposing a license fee for the transportation of persons or property on highways by motor vehicles for hire or compensation, but excluding vehicles operating exclusively within incorporated cities or towns and the like (Ex parte Bush, 1936, 6 Cal.2d 43, 56 P.2d 511); a statute which gives preference to vehicles used in the business of their owners over those used by common carriers. Bradley v. Public Utilities Commission of Ohio, 1933, 289 U.S. 92, 53 S.Ct. 577, 77 L. Ed. 1053, 85 A.L.R. 1131. In the case last cited, the Court said: "It is contended that the statute as applied to the plaintiff violates the equal protection clause of the Fourteenth Amendment. * * * One argument is that the statute discriminates unlawfully against common carriers in favor of shippers who operate their own trucks. In dealing with the problem of safety of the highways, as in other problems of motor transportation, *the state may adopt measures which favor vehicles used solely in the business of their owners, as distinguished from those which are operated for hire by carriers who use the highways as their place of business.*" Bradley v. Public Utilities Commission, 289 U.S. 92, 97, 53 S. Ct. 577, 579, 77 L.Ed. 1053, 85 A.L.R. 1131. (Italics added.)

Even if it be conceded that the enforcement of the statute may result in an advantage to residents of the state selling used automobiles, we should not, because of this, deny validity to it. The legislation being clearly within the state's power, neither legislative motives nor legislative polity should call for judicial interference. As said by the Supreme Court in South Carolina State Highway Dept. v. Barnwell Bros., Inc., 1938, 303 U.S. 177, 190, 191, 58 S.Ct. 510, 517, 82 L.Ed. ——:

"When the action of a Legislature is within the scope of its power, fairly debatable questions as to its reasonableness, wisdom, and propriety are not for the determination of courts, but for the legislative body, on which rests the duty and responsibility of decision. Jacobson v. Massachusetts, 197 U.S. 11, 30, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765; Laurel Hill Cemetery v. San Francisco, 216 U.S. 358, 365, 30 S. Ct. 301, 54 L.Ed. 515; Price v. Illinois, 238 U.S. 446, 451, 35 S.Ct. 892, 59 L.Ed. 1400; Hadacheck v. Sebastian, 239 U.S. 394, 408–414, 36 S.Ct. 143, 60 L.Ed. 348, Ann. Cas.1917B, 927; Thos. Cusack Co. v. Chicago, 242 U.S. 526, 530, 37 S.Ct. 190, 61 L.Ed. 472, L.R.A.1918A, 136, Ann.Cas.1917C, 594; Euclid v. Ambler Realty Co., 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303, 54 A. L.R. 1016; Zahn v. Board of Public Works, 274 U.S. 325, 328, 47 S.Ct. 594, 595, 71 L. Ed. 1074; Standard Oil Co. v. Marysville, 279 U.S. 582, 584, 49 S.Ct. 430, 73 L.Ed. 856. *This is equally the case when the legislative power is one which may legitimately place an incidental burden on interstate commerce. It is not any the less a legislative power committed to the states because it affects interstate commerce, and courts are not any the more entitled, because interstate commerce is affected, to substitute their own for the legislative judgment.*" (Italics added.)

Hence my conviction that the challenged Act is a valid exercise of the police power of the state, which does not transgress the commerce clause (Constitution of the United States, Art. 1, Sec. 8, U.S.C.A.Const. art. 1, § 8) or the equal protection or due process clauses of the Constitution of the United States. Constitution of the United States, Fourteenth Amendment, Cl. 1, U.S.C.A.Const. Amend. 14, § 1.